755 So.2d 616 (2000)
Paul Alfred BROWN, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. SC90540.
Supreme Court of Florida.
March 9, 2000.
Rehearing Denied April 26, 2000.
*619 Terri L. Backhus, Tampa, Florida; and John Moser, Capital Collateral Regional Counsel, Harry P. Brody, Assistant CCRC and John Abatecola, Assistant CCRC, Office of the Capital Collateral Regional Counsel-Middle Region, Tampa, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Robert J. Landry, Assistant Attorney General, Tampa, Florida, for Appellee.
PER CURIAM.
Paul Brown, a prisoner under sentence of death, appeals the trial court's denial of his motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the trial court's denial.

I. PROCEDURAL HISTORY
Brown was found guilty and sentenced to death in 1987 for the murder of seventeen-year-old Pauline Cowell on March 20, 1986. The factual circumstances of this case are set forth in our opinion on direct appeal, in which this Court affirmed Brown's conviction and sentence. Brown v. State, 565 So.2d 304, 304-06 (Fla.1990). On November 26, 1990, a petition for writ of certiorari was denied by the United States Supreme Court. Brown v. Florida, 498 U.S. 992, 111 S.Ct. 537, 112 L.Ed.2d 547 (1990). In 1992, Brown filed his initial postconviction motion under Florida Rule of Criminal Procedure 3.850. The circuit court dismissed the initial motion without prejudice, and Brown filed two amended rule 3.850 motions in 1992. Public records litigation pursuant to chapter 119, Florida Statutes, was ongoing in the case. On October 12, 1994, the circuit court granted Brown's motion to disqualify the Hillsborough County State Attorney's Office because of potential conflict in that Brown's former defense counsel had become employed there as an assistant state attorney. The State appealed, and this court quashed the order without opinion on January 31, 1995. Brown filed his third amended rule 3.850 motion in 1996.[1]
*620 The circuit court summarily denied twelve of Brown's sixteen claims. State v. Brown, No. 86-4084 (Fla. 13th Cir. Ct. order filed Nov. 12, 1996) (Order I). The court found six of the claims to be procedurally barred because they were raised or could have been raised on direct appeal.[2]Id. at 5. The court found three of the claims to be procedurally barred because Brown had attempted to circumvent the procedural bar by couching the issues as ineffective assistance of counsel.[3]Id. After setting forth analysis and record attachments, the court found three other claims to be without merit.[4]Id. at 6-8. The court reserved for an evidentiary hearing the remaining four claims: lost or destroyed evidence, claim 3; prosecutorial misconduct, claim 6; ineffective assistance of counsel at the guilt phase of Brown's trial, claim 7; and ineffective assistance of counsel at the penalty phase of Brown's trial, claim 8. Id. at 6.
A week before the date of the evidentiary hearing, the then-presiding circuit judge recused himself because he had not yet attended the required "Handling Capital Cases" course. The hearing before another circuit judge took place on March 3, 1997. Following the evidentiary hearing, the court issued a five-page written order denying relief on the four claims upon which the evidentiary hearing was held. State v. Brown, No. 86-4084 (Fla. 13th Cir. Ct. order filed Apr. 8, 1997) (Order II). In her order, the circuit judge found no basis for disturbing the previous circuit judge's order denying the remaining twelve claims without an evidentiary hearing. Id. at 2. The circuit judge noted *621 in her order that she had given Brown an opportunity to present evidence and argument on any of the sixteen claims but that Brown had declined to do so except for the four claims reserved for evidentiary hearing. Id.

II. ISSUES ON APPEAL
In this appeal, Brown raises fourteen claims.[5] Within those claims, he contends that the circuit court failed to adequately address the twelve issues summarily denied by the previous circuit judge and disputes the circuit court's findings and rulings on three of the four issues[6] considered at the evidentiary hearing. We find no error in the circuit court's order. Nine of Brown's claims raised in this appeal in this Court are procedurally barred,[7] and we find no need to discuss them. We will address only claim I, a portion of claim II, and claims III, IV, and X.

Claim I. CCP Jury Instruction
In his first claim, Brown argues that his conviction must be reversed because the jury instruction given as to the aggravating factor of cold, calculated, and premeditated (CCP) was unconstitutionally vague. Brown points out that, in the direct appeal in this case, this Court rejected Brown's constitutionality argument on the basis that Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), did not apply to Florida and to this aggravating factor. See Brown, 565 So.2d at 308. Brown also notes that, subsequent *622 to Brown, the United States Supreme Court in Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), and Hodges v. Florida, 506 U.S. 803, 113 S.Ct. 33, 121 L.Ed.2d 6 (1992), undercut the efficacy of this Court's reasoning in the Brown decision.
Although Brown does not refer to it in the present appeal, Jackson v. State, 648 So.2d 85 (Fla.1994), was a decision subsequent to Brown in which we discussed Brown and acknowledged that this Court's opinion as to the inapplicability of Maynard to CCP instructions had been "discredited in Espinosa" and "undercut by Hodges." Jackson, 648 So.2d at 88. In Jackson, we held that:
Florida's standard CCP jury instruction suffers the same constitutional infirmity as the HAC-type instructions which the United States Supreme Court found lacking in Espinosa, Maynard, and [Godfrey v. Georgia, 446 U.S. 420, 428-29, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980)].
648 So.2d at 90. However, we then held:
Claims that the instruction on the cold, calculated, and premeditated aggravator is unconstitutionally vague are procedurally barred unless a specific objection is made at trial and pursued on appeal. James v. State, 615 So.2d 668, 669 & n. 3 (Fla.1993).
648 So.2d at 90. We followed Jackson with Walls v. State, 641 So.2d 381 (Fla. 1994), in which we held in respect to Jackson constitutional error as to the CCP instruction:
To preserve the error for appellate review, it is necessary both to make a specific objection or request an alternative instruction at trial, and to raise the issue on appeal.
Walls, 641 So.2d at 387. In Pope v. State, 702 So.2d 221 (Fla.1997), we again addressed the preservation issue and held:
However, we have made it clear that claims that the CCP instruction is unconstitutionally vague are procedurally barred unless a specific objection is made at trial and pursued on appeal. The objection at trial must attack the instruction itself, either by submitting a limiting instruction or making an objection to the instruction as worded.
702 So.2d at 223-24. Since our decision in Brown's direct appeal on this issue was reached on the basis of our holding that Maynard did not apply, we did not reach the issue of preservation of the claim at trial. We have in this appeal reviewed the trial record to determine whether the issue was preserved by an objection to the instruction as worded or by a request for a limiting instruction. We find that defense counsel's only objections to the CCP instruction were presented at the jury instruction conference and the allocution hearing:
I object to that one. There is no basis in the evidence before the Court. It is insufficient evidence to border [sic] on the instruction on that.
Later, at the allocution hearing before the court prior to sentencing, defense counsel argued against the application of the CCP aggravator as follows:
The case law is quite clear that aside from legal premeditation, the proof that a capital felony is committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification requires proof of much greater weight than does the mere premeditation required to prove a first degree murder case.... I do not believe that the evidence is weighty enough or convincing enough to show that this capital felony was committed in a cold, calculated and premeditate[d] manner within the meaning of the aggravating circumstance in the statute.
Defense counsel neither submitted a limiting instruction nor specifically objected that the CCP instruction was unconstitutionally vague, as we required in Pope. Accordingly, we find that defense counsel's objection did not preserve this issue for *623 appellate review in accord with Jackson, Walls, and Pope.

Claim II. Ineffective Assistance by Penalty-phase Counsel in Failing to Object to Closing Argument
In this subclaim of claim II, Brown contends that his penalty-phase counsel, Craig Alldredge, was prejudicially ineffective in that he failed to object to a portion of the penalty-phase closing argument by Assistant State Attorney Michael Benito that described positive aspects of life in prison in support of the prosecutor's argument against a life sentence. In her order, the circuit judge held in respect to this claim:
Evidence relating to [this claim] was presented by testimony of Wayne Chalu,... lead trial counsel for the defense, and Craig Alldredge, ... penalty phase trial counsel for the defense. The claim is essentially that trial counsel was ineffective for failing to object to the prosecutor's improper closing argument in the second phase...:
What about life imprisonment, ladies and gentlemen? What about life imprisonment? Now I am not saying that I would like to spend one day in jail, all right, don't get me wrong, but what about life imprisonment? What can one do in prison? You can laugh; you can cry; you can eat; you can sleep; you can participate in sports; you can make friends; you can watch TV; you can read; in short, you live to learnyou live to learn about the wonders that the future holds. In short, it is life.
It is undisputed that counsel for the defense did not object. Mr. Chalu was familiar with the prosecutor's use of this argument and was also aware that such argument had not been found to be improper at that time. Mr. Alldredge testified that he was not aware that such argument was improper, that he would have objected had he known, and that he did not object. Assuming without deciding that penalty phase counsel was deficient in his performance for failing to object to this portion of the prosecutor's argument, this Court cannot and does not find that the alleged deficient performance resulted in prejudice which meets the prejudice prong of Strickland v. Washington, 466 U.S. 688[668, 104 S.Ct. 2052, 80 L.Ed.2d 674] (1984), that is, a reasonable possibility that the outcome would have been different.
Order II at 2-3 (citations omitted).
Based upon our review of the trial record, we agree with the circuit court that Brown's claim in respect to this portion of the State's argument fails to meet the prejudice prong of Strickland, as recently reiterated by this Court in Jones v. State, 732 So.2d 313 (Fla.1999).[8] The circuit court's ruling is consistent with this Court's holding in Jackson v. State, 522 So.2d 802, 809 (Fla.1988), that a similar unobjected-to argument would not be grounds for reversal for a new penalty phase. See also Hodges v. State, 595 So.2d 929, 933 (Fla.1992); Hudson v. State, 538 So.2d 829, 832 n. 6 (Fla.1989). Although we did find a similar claim as to the denial of an objection to be harmful error in Taylor v. State, 583 So.2d 323 (Fla.1991), we did so on the basis of harmless error record review.[9] In sum, under the circumstances *624 of this case, we do not find that the failure to object to this argument was conduct by counsel that deprived the defendant of a trial whose result was reliable.
Although we agree that Brown's claim fails to meet the prejudice prong of Strickland, we also have reviewed the evidentiary record to evaluate whether counsel's failure to object violates the first prong of Strickland. In this case, both defense counsel Wayne Chalu, who had primary responsibility for the entire case, and defense counsel Craig Alldredge, who handled the penalty phase, testified at the postconviction evidentiary hearing. Chalu, who is now an assistant state attorney in the Thirteenth Judicial Circuit, was at the time of this trial an experienced felony litigator who had been an assistant public defender in the Thirteenth Circuit for about eight years, had received special training in handling capital cases, and had handled several prior capital cases. Chalu had overall responsibility for preparing and presenting Brown's entire case. Throughout the proceedings, Chalu worked closely with Alldredge, who was assigned to handle the penalty phase. At the time of the trial, Alldredge had been an assistant public defender in the Thirteenth Circuit for about six years and had handled the guilt phases of two other capital cases. This was the first case in which Alldredge had lead responsibility for the penalty phase. Alldredge subsequently became an assistant federal public defender.
In the evidentiary hearing below, Chalu described his working relationship with Alldredge during this case as follows:
[W]e talked to each other constantly. We're in the same office. We're just a few feet away from each other, and we talked about the case probably daily.... [B]asically, I was working on the guilt phase and [Alldredge] was working on the penalty phase. Of course ... we both pretty much knew what the other was doing in terms of preparation because we talked about it all the time.
Chalu testified that at time of the trial he understood that no case law had found reversible error in a court's allowing the challenged penalty-phase closing argument. Chalu further testified:
I personally don't think it was so bad. I think we capitalized on it, too. Mr. Alldredge sort of capitalized on that. In their closing, it seemed closest to me innuendo if you're alive, you can do these things; if you are not, you can't. I didn't think it was that prejudicial.
Alldredge testified at the evidentiary hearing that he saw no reason to object during the prosecutor's presentation of the now-challenged portion of the closing argument because he did not consider the argument to be improper. The trial record reflects that Alldredge, in arguing for a life sentence, presented in penalty-phase closing argument a grim description of life in prison in order to counter the prosecutor's positive characterization of life in prison. Alldredge answered the prosecutor's argument by describing prison life in these contrasting terms:
Mr. Benito tells you life in prison ain't that bad. The number one cause of death in [the] Florida State Prison system is suicide, so if it ain't that bad, there are a lot of men who are obviously making terrible mistakes.
It's a world of reinforced concrete, and steel, and steel doors, and coils of razor wire, and electric fences, and machine guns, and shotguns. Mr. Benito says he'll make friends and be able to enjoy sports. He will spend the rest of his life with men who society has found *625 their presence so abhorred that they have to be locked away.
Paul Brown will most likely get out of prison when he dies....
He is going to die. We all have to die. His life has been garbage. If he spends the rest of his life in prison, the rest of his life is going to be garbage, too, but it will be life.
. . . .
... If Judge Spicola sentences him to life in prison, he will spend life in prison. He's not going to harm another innocent person, again.
We find that defense counsel's failure to object does not fall below the standard of constitutionally effective counsel as provided in Strickland. Moreover, we find no basis in the evidence to reject trial counsel's opinion that Alldredge capitalized upon the complained-of closing argument in presenting his own argument for a sentence of life in prison.[10] Accordingly, we find no merit in Brown's claim that trial counsel was ineffective in failing to object to the prosecutor's penalty-phase closing argument.

Claim III. Guilt-phase Ineffective Assistance of Counsel

A. Ineffective Assistance of Counsel Claims
Brown contends within this claim that he was denied a full and fair hearing in that the postconviction circuit court did not address all the points he raised concerning ineffective assistance of counsel during the guilt phase of his trial. Brown contends that the record demonstrates the following ineffective assistance of counsel: (a) defense counsel failed to present to the jury certain exculpatory evidence; (b) defense counsel failed to attack the credibility of certain State witnesses; (c) due to the State's failure to disclose to defense counsel until the first day of trial the location of two of the State's witnesses, defense counsel was rendered unable to investigate exculpatory evidence these witnesses could have contributed; (d) defense counsel failed to present exculpatory evidence as to Brown's mental instability, alcohol abuse, and delusional thinking; (e) defense counsel failed to inform the jury that Brown's courtroom demeanor was affected by antidepressant and antipsychotic drugs administered to him at the Hillsborough County Jail; (f) defense counsel conceded guilt without Brown's consent; (g) defense counsel failed to object or move for a mistrial after learning that the jury had been exposed to a newspaper article concerning the trial; (h) defense counsel's efforts were hampered because the investigator assigned to Brown's case failed to undertake the requested investigation; (i) defense counsel failed to explore a diminished capacity defense showing that Brown was psychotic, sleep-deprived, and intoxicated at the time of the offense; and (j) the cumulative effect of an incomplete investigation, overwhelming public defender caseload, and concealment of key witnesses by the State deprived Brown of his due process rights. In reviewing these claims, we have considered the trial record and the record of the postconviction evidentiary hearing, including the circuit court's order.

B. Trial Record
The trial record reflects the following as to the guilt phase of Brown's trial. The State presented eleven witnesses, four of whom were cross-examined by Chalu. Among the State witnesses was Hillsborough County Sheriffs Detective Paul Davis, who testified as to Brown's statements to police at Brown's residence and in a patrol car on the day of the murder. Brown told Davis that he had gone to the house where the victim was staying with her sister and that he had parked nearby. *626 Brown cut away a padlock on a door of the house with a pair of bolt cutters that he was carrying. He went back to his car, moved his car to the front of the house, and retrieved his gun from under the seat of the car. With the gun in his belt, Brown walked up to the residence where he had cut the padlock, walked through the door he had unlocked, woke the victim, and told her he wanted to talk to her. She shouted at him to leave. Brown immediately shot her in the head and then shot in the head a child who was sleeping in the same bed.[11] Upon cross-examination of Detective Davis, Chalu established that Brown had told Davis he did not enter the house and awaken the victim with the intent to kill her.
Chalu presented no evidence during the guilt phase. By declining to put on evidence, defense counsel gained the right to present an additional guilt-phase closing argument in rebuttal to the State's closing argument. The judge instructed the jury on armed burglary and lesser offenses including armed trespass. He also instructed upon first-degree felony murder, premeditated murder, and lesser homicide charges including second and third-degree murder.

C. Postconviction Evidentiary Hearing
The record of the postconviction evidentiary hearing reflects the following. Chalu was responsible for presentation of the entire case and represented Brown during the guilt phase of the trial. As stated previously in discussing claim II, Chalu worked closely throughout the trial with co-counsel Alldredge, who represented Brown during the penalty phase only.
Chalu testified at the postconviction hearing that, upon his appointment to represent Brown, he immediately engaged the services of psychologist Dr. Robert Berland because of "certain red flags" noticed by Chalu, such as Brown's appearing to be of "sub-average intelligence" and possibly exhibiting signs of "sub-clinical mental illness." Chalu testified that both he and Alldredge talked with Berland and other mental-health experts in order to decide upon their defense strategy and to facilitate data collection as to Brown's history. Chalu determined that nothing the experts found before the trial relevant to Brown's mental state would be useful in support of Brown's case during the guilt phase of the trial. Thus, mental health expert testimony was used only in the penalty phase. Chalu testified that he and the mental health experts knew that Brown was receiving anti-psychotic medication at the Hillsborough County Jail but that he did not present this information to the judge or jury because he had decided not to employ a mental health defense in the guilt phase.
Chalu testified that his theory of defense was dictated by three factors: Brown's account to Chalu of how the murder had occurred; mental health experts' accounts of what they understood to be Brown's mental state at the time of the offense; and the fact that the trial court had denied the defense motion to suppress Brown's confession. Chalu explained that, once he knew the confession would be admitted into evidence, he determined that the only viable defense as to felony murder was to argue for a lesser offense of armed trespass, rather than armed burglary, which would support a verdict of third-degree murder. As to premeditated murder, Chalu's strategy was to argue, as Brown stated in his confession, that he shot the victim only on an impulse and had no preformed intent to kill her when he entered the room where she was sleeping and woke her.
Chalu stated that he interviewed several of Brown's relatives, including Brown's father, before the trial and determined that they could offer no testimony in support of Brown's guilt-phase defense. Chalu testified that, if he had discovered any information *627 from family members or others relevant to premeditation, he would have presented such testimony at the guilt phase. As to his strategy of declining to present defense evidence, Chalu explained:
[W]e had an uphill battle because once the motion to suppress confession was denied, we had to figure out some way to try to prevent the case from going into penalty phase, to try to get a lesser.
So all my efforts were directed to and all the tactics that I employed in my first phase were directed to maximizing the possibility of getting a lesser, and one of those was to try to keep the opening and closing argument and not put on any evidence in the first phase.
Upon cross-examination, Chalu stated that his strategy of declining to present evidence and seeking a conviction of a lesser offense had been successful in at least one other first-degree murder trial in which he had faced prosecutor Benito.
Chalu testified that in communicating this trial strategy to Brown,
I always took great pains to try to make sure that Mr. Brown understood what we were saying because he was a little slow.... We were trying to get him to understand everything we were saying and the rationale for what we were doing as much as we were able to.
Chalu testified that the prosecutor had not offered any plea bargain for a life sentence but that he had offered to allow Brown to plead guilty to first-degree murder and proceed directly to the penalty phase. Chalu testified that he informed Brown of this option, and Brown chose to reject it. As to Brown's consent to the defense strategy of conceding guilt to a lesser degree of murder, Chalu testified, "Mr. Brown was pretty much agreeable to pretty much everything we did, to be honest with you."
Chalu testified that he had no problem receiving information requested from the investigator assigned to the case. As to school and jail records, Chalu stated that it was ultimately his responsibility to retrieve any relevant records and that he believed at the time of the trial that all relevant records had been gathered. As to the State witnesses made known to defense counsel for the first time on the first day of trial, Chalu testified that he asked the judge for time to depose them, took brief depositions, and determined that their testimony was not "of any great consequence to the case."
Chalu testified that he saw no reason to move for a mistrial after learning that at least one juror had been exposed to pretrial publicity, because he was satisfied after the judge's inquiry that the jurors had not read the article in question or had only read the headline. Therefore, he stated, it was "inconsequential and not worth pursuing any further because there was no prejudice to the jury or to Mr. Brown because of the incident."
On cross-examination by the State, Chalu testified that he had been able to keep the jury from hearing any evidence as to the State's theory of Brown's motive for this offense, which was that Brown wanted to keep the seventeen-year-old victim, who was the daughter of his girlfriend, from reporting to authorities the fact that she and Brown had had a sexual relationship. Chalu also was able to exclude evidence of a robbery and shooting allegedly committed by Brown later on the day of the instant murder.
During the postconviction evidentiary hearing, Brown also presented the testimony of Dr. Steven Szabo, a psychiatrist who evaluated Brown in the Hillsborough County Jail where Brown was awaiting trial in March 1986. Dr. Szabo testified that he diagnosed Brown as schizophrenic and prescribed Mellaril, an antipsychotic medication, but that this medication was never forced upon Brown. Szabo testified that he would have presented this testimony at Brown's trial in 1987 but that he was not contacted by counsel for Brown.
*628 After considering this evidence and argument based on this evidence, the circuit court denied Brown the relief he requested in his guilt-phase ineffective assistance claims, concluding that Brown failed to meet both the ineffectiveness and prejudice prongs of the Strickland test. The circuit court order stated in relevant part:
The testimony of Mr. Chalu, guilt phase counsel for the defense, refutes any deficiency in investigation, objections, or preparation and the Defendant has failed to show any deficiency. Guilt phase counsel had a clear theory of defense, i.e., lack of intent, and the record shows that he meticulously prevented the introduction of highly prejudicial evidence against his client. Assuming once again that the Defendant could show some deficient performance, he does not show how such resulted in prejudice. Even with the benefit of hindsight, it does not appear that guilt phase counsel would have done things differently.
Order II at 4.

D. Discussion of Circuit Court Postconviction Order
Brown challenges the sufficiency of the circuit court's order denying postconviction relief on alleged ineffective assistance of counsel at the guilt phase. Brown claims that the court erred by failing to attach relevant portions of the record in support of its denial of this claim and by failing to address certain points raised in his postconviction motion. We have recently clarified that record attachments are not required for a postconviction order if a court has stated its rationale in its written order denying postconviction relief. Diaz v. Dugger, 719 So.2d 865, 867 (Fla.1998); see also Mills v. State, 684 So.2d 801, 804 (Fla.1996); Roberts v. State, 678 So.2d 1232, 1236 (Fla.1996). Here, the record reflects that the circuit judge entered her order after hearing testimony relevant to this postconviction claim from defense counsel Chalu and Alldredge, as well as from Brown's childhood neighbor and Brown's brother and stepbrother. Brown himself did not testify at the postconviction evidentiary hearing. The record reflects that the circuit judge held a full evidentiary hearing, addressed the relevant points raised by Brown, and adequately explained the rationale for her decision denying relief. We find no error in the circuit court's postconviction proceedings and order.

E. Discussion of Guilt Phase Ineffective-Assistance Claims

1. Exculpatory Evidence
We begin our inquiry into whether the performance of Chalu was deficient by recognizing: (1) there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, 104 S.Ct. 2052; and (2) Brown bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. Id. at 688-89, 104 S.Ct. 2052. Brown argues that Chalu failed to adequately investigate the possibility of an intoxication defense and failed to question others, including Brown's brother, Jimmy Brown, who could have testified as lay witnesses as to Brown's condition immediately preceding the crime. After the court denied the defense motion to suppress Brown's confession, Chalu determined that the only viable defense was to concede that Brown had committed the murder and argue for a conviction of a charge less than first-degree murder. In considering his strategy, Chalu concluded that the available potential witnesses, such as Jimmy Brown, could not present evidence of Brown's state of mind prior to the murder such that an insanity or diminished capacity defense would be viable. The record reflects that Chalu also made strategic decisions not to present to the jury certain witnesses who might have revealed to the jury prejudicial information about Brown's criminal history. *629 Chalu made an informed evaluation of his options and then presented a defense of lack of intent to commit premeditated murder. Chalu also argued that the State failed to prove intent to commit armed burglary. If successful, these defenses would have left only armed trespass as the underlying felony to support a felony murder conviction, which would not have been first-degree felony murder. In view of the trial record and the testimony of Chalu, we agree with the circuit court that Brown failed to demonstrate that the performance of Chalu fell below the Strickland standard. See Strickland, 466 U.S. at 691, 104 S.Ct. 2052; Sims, 155 F.3d at 1306.

2. State Witnesses
Brown contends that Chalu failed to make an effective attack on the credibility of State witnesses Gail and Barry Barlow, who were in the house with the victim at the time of the murder, and to investigate mitigating evidence the Barlows might have provided as to Brown's mental instability, alcohol abuse, and delusional thinking. At trial, Chalu objected to their testimony because he had not been notified that the State would call them as witnesses, and the prosecutor argued that they should be allowed to testify because he had only recently discovered their location. The trial court allowed Chalu to depose these witnesses after the end of the first day of trial, and they subsequently testified without cross-examination by Chalu. In the postconviction hearing, Chalu stated that during deposition he found the Barlows to be hostile to Brown and stated, "I don't think they would have assisted me at all in any manner." On this record, we conclude that the strategic decision of Chalu not to cross-examine the Barlows or present their testimony during the penalty phase was well within the range of professional assistance. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.")

3. Prescription Drugs
Brown argues that Chalu was ineffective in failing to inform the jury that Brown's inability to react during trial was caused by antidepressant and antipsychotic medication administered at the Hillsborough County Jail. Brown argues that counsel should have either notified the jury of Brown's medicated state, requested that the medication be stopped, or requested a medical reason for Brown's involuntary medication. Brown contends that information about this medication was critical for the jury to consider in assessing whether Brown could have formed sufficient specific intent to support his guilt or premeditation and in deciding how to weigh potential mental health mitigators when recommending Brown's sentence. The record reflects that Chalu testified in the postconviction hearing that he and the defense mental health experts knew that Brown was being administered the drugs but that Chalu chose not to present this information to the judge or jury during the guilt phase because he was not presenting a mental health defense and Brown did not testify This claim does not meet either prong of Strickland.

4. Concession of Guilt
Brown contends that Chalu failed to act as an advocate for Brown at the guilt phase of the trial and did not adequately inform him of the trial strategy of conceding guilt. The record reflects that the State's primary evidence was a confession from Brown, in which he told police officers that he entered the house where the victim was sleeping and shot her when she began shouting for him to leave. Chalu testified in the postconviction evidentiary hearing that, once the motion to suppress Brown's confession was denied, defense counsel made the tactical decision to argue during the guilt phase for a conviction of the lesser offense of armed trespass, rather than armed burglary, which *630 would enable Brown to avoid a first-degree murder conviction. As to premeditation, Chalu presented the defense that Brown did not have an intent to kill when he entered the house where the victim was sleeping and encountered her there, and thus he was guilty at most of second-degree murder.
During cross-examination, Chalu established that Brown had told Detective Davis he did not enter the house and awaken the victim with the intent to kill her. In his guilt-phase closing argument, Chalu told the jury:
The fact is Mr. Brown is guilty of homicide, but he is not guilty of murder in the first degree.
. . . .
... I have raised a reasonable doubt, several reasonable doubts as to Mr. Brown's intent when he went over to the house that night and committed those crimes, because his intent is what this case boils down to.
If he did not have a fully formed conscious intent to kill, then he is not guilty of first-degree murder.
If he did not have a fully formed conscious intent to commit a crime when he entered that home, then he is not guilty of armed burglary.
. . . .
[Second-degree murder] is an act or a series of acts that, one, a person of ordinary judgment would know is reasonabl[y] certain to kill or do serious bodily injury to another, and is done from, and here is the Defendant's intent, ill will, hatred, spite, or an evil intent. "I went in there to find out why she was lying about me." Murder in the second degree. An impulsive act out of ill will, spite, or an evil intent. That is a depraved mind, second degree murder.
... [B]eyond any reasonable doubt Mr. Brown is guilty of murder in the second degree, a most serious crime as the Judge will instruct you. It carries up to life in the Florida State Prison.
. . . .
... [I]f you find the Defendant guilty of first degree murder, you're finding him guilty of the charge which has not been proven beyond a reasonable doubt.
Has second degree murder been proven beyond a reasonable doubt? It most certainly has.
Thus, the record reflects that Chalu did not concede first-degree premeditated murder or felony murder, but rather, the record supports that Chalu set upon a strategy to do what he reasoned he could do in light of Brown's confession to convince the jury to find Brown guilty of a lesser offense. Faced with the overwhelmingly inculpatory evidence of Brown's confession, Chalu made his informed decision to argue for a lesser conviction in an effort to avoid a death sentence. See McNeal v. Wainwright, 722 F.2d 674 (11th Cir.1984). In this case, we find that Chalu provided full representation to Brown and made reasonable, informed tactical decisions as to his defense. Thus, we find that Chalu did act as an advocate for Brown, who has failed to demonstrate that Chalu's tactical decision to argue for a conviction on a lesser charge constitutes ineffective assistance of counsel under either prong of Strickland.
On this record, it is clear that Chalu repeatedly informed Brown of his strategy, believed that Brown understood it, and concluded that Brown agreed with the strategic approach. As to trial strategy, Chalu testified that Brown was cooperative and "agreeable to pretty much everything we did." We note that Brown did not testify as to this or any other claim during the postconviction hearing. Thus, on this record, we find that Brown has demonstrated no ineffectiveness because the evidence presented during the postconviction hearing was that Chalu insured Brown's understanding of the implications of conceding guilt to a lesser homicide charge and that Brown consented to Chalu's trial strategy.

*631 5. Voir Dire as to Newspaper Article
This claim is discussed separately in the subdivision dealing with Claim X, Brown's claim of ineffective assistance of counsel as to an inquiry concerning juror misconduct.

6. Diminished Capacity Defense
Brown contends that Chalu was ineffective in that he failed to present evidence of Brown's mental psychosis as well as sleep deprivation, exhaustion, or intoxication at the time of the murder. According to the trial record, Brown told police detectives that he was not intoxicated on drugs or alcohol at the time of the murder and that he had a clear memory of the murder and events surrounding it. At the evidentiary hearing, Chalu testified that he conferred at length with Brown as to his mental state at the time of the murder and with mental health experts who had examined Brown. From these conversations and reports, Chalu concluded that there was no evidentiary support for an insanity defense or a lack of specific intent based on intoxication. Thus, based on evidence in this record, we find that the performance of Chalu as to this claim did not fall below the Strickland standard.

7. Prejudice
We agree with the circuit court that, even assuming that Chalu was ineffective, Brown did not demonstrate prejudice. Any defense that Chalu chose to present would have been overshadowed by the overwhelmingly inculpatory evidence at trial of Brown's confession to police. Not only did Chalu present a potentially viable defense within the parameters dictated by the confession, he also prevented the jury from learning of evidence of a subsequent robbery and shooting allegedly committed by Brown and the State's theory of Brown's motive for this offense, which was Brown's desire to silence the seventeen-year-old victim, with whom he had had a sexual relationship.[12] Although Chalu did not succeed in preventing a first-degree murder conviction, he did succeed in preventing even more prejudicial evidence from reaching the jury. On this record, we conclude that Brown has failed to establish a reasonable probability that, absent the claimed errors, the jury would have found him not guilty of first-degree murder. Competent, substantial evidence supports the circuit court's factual findings. Thus, we do not disturb those findings. Based on our review of the record, we agree with the circuit court that Brown failed to demonstrate the required prejudice.

Claim IV. Penalty-phase Ineffective Assistance of Counsel

A. Introduction
Brown contends in his fourth claim in this appeal that he was denied effective assistance of counsel during the penalty phase of his trial. Brown bases this claim upon the following allegations: (1) counsel failed to perform an adequate investigation in order to obtain necessary background information for mitigation; (2) counsel conceded aggravating circumstances without notice to Brown; (3) counsel failed to object to an improper closing argument; and (4) counsel failed to inform the jury that Brown's courtroom demeanor was affected by antidepressant and antipsychotic prescription drugs administered at the Hillsborough County Jail or, alternatively, to request that the medication be terminated. In our review of this claim, we have considered the trial record, the record of the postconviction evidentiary hearing, and the circuit court's postconviction order.

B. Trial Record
The trial record reflects the following. At the request of defense counsel, the trial court appointed Dr. Robert Berland and Dr. Walter Afield to evaluate Brown's mental state for purposes of the guilt phase and then to help in developing evidence of statutory and nonstatutory mitigation for the penalty phase. Dr. Berland *632 is a clinical psychologist specializing in forensic psychology who had been licensed to practice psychology for ten years at the time of the trial. He had worked for eight years with criminally committed mentally ill patients at Florida State Hospital at Chattahoochee, and at the time of the trial in 1987, he was engaged in private practice performing court-ordered evaluations of criminal defendants. At the time of the trial, Dr. Afield had been a physician specializing in psychiatry for twenty-six years. Dr. Afield was board certified in adult psychiatry, child psychiatry, and mental health administration and had previously served on the medical school faculties at Harvard University, Johns Hopkins University, and the University of South Florida. At the time of the trial, he had been engaged in the private practice of psychiatry for twelve years.
Dr. Berland testified during the penalty phase that, in preparing to make an evaluation as to Brown's mental and emotional status, he reviewed Brown's jail medical records, police reports, and depositions related to this case. He also reviewed a 1980 psychological profile and administered several standardized psychological tests, including an intelligence test, to Brown. Dr. Berland interviewed Brown on at least five separate occasions. Based on these interviews, his test results, and his review of the relevant documents, Dr. Berland testified during the penalty phase that he found Brown to be operating mentally below normal with an IQ of 81. Dr. Berland concluded that Brown had organic brain damage and opined that Brown was psychotic and probably was suffering from bipolar disorder. Dr. Berland stated that he believed Brown was under the influence of a mental or emotional disturbance but that he could not say whether the disturbance was extreme at the time of the crime. Dr. Berland opined that Brown's capacity to appreciate the criminality of his conduct was not impaired but that his capacity to conform his conduct to the requirements of the law was impaired, although not substantially impaired, at the time of the crime. He testified that the impairment resulted from interaction between Brown's low intelligence and his psychotic disturbance, which had the effect of increasing his impulsiveness and diminishing his ability to make sound judgments. Dr. Berland also stated that his test results indicated that Brown did not have tendencies toward being a "cold-blooded" killer.
Defense counsel also presented during the penalty phase the testimony of Dr. Afield, who testified that he reviewed jail records and Dr. Berland's test results and interviewed Brown once. During this interview, Brown told Afield he was abused as a child, married at age sixteen, had been knocked unconscious in several accidents, and lived a marginal existence as a junk man and "street person." Based on this history and his review of the records, Afield opined that Brown was mentally retarded, suffered from organic brain damage, and was psychotic. He further testified that he believed that, although Brown had an antisocial personality disorder, he knew right from wrong. In contrast to Dr. Berland, Afield opined that Brown's ability to conform his conduct to the requirements of the law was substantially impaired at the time of the murder.
Defense counsel also presented during the penalty phase as lay witnesses Brown's father, his stepmother, and his brother, who testified as to Brown's childhood. Brown's father testified that he did not live with Brown and his mother when Brown was a child. He stated that juvenile authorities removed Brown from his mother's custody when he was five or six years old because the family was living in "pure filth." Brown and his brother went to live on a farm in the custody of their great aunt, who beat Brown with wet rags and corn shucks. Three years later, Brown began living with his father and stepmother in Tampa, where he attended school. Brown's father testified at trial that his son was not a good student but that he did *633 not get into trouble in school. As an adult, Brown fathered and supported children, helped his neighbors, and held jobs, including his most recent occupation of collecting cans for recycling. Brown's stepmother, Wanda Brown, testified that Paul was "always sweet" and that he was a slow learner. Brown's brother, Jimmy Lee Brown, testified that Brown was beaten as a child and was a slow learner who helped others and was never violent.

C. Postconviction Evidentiary Hearing Record
The record of the postconviction evidentiary hearing before the circuit court reflects the following. With the assistance of Chalu, defense counsel Alldredge represented Brown during the penalty phase. We have previously set forth the relevant legal experience of Chalu and Alldredge. Chalu testified that he was initially appointed to handle Brown's case, and about three months before the trial, Alldredge was appointed solely to handle the penalty phase. Both Chalu and Alldredge worked with the investigator who was assigned to assist them. Immediately after his appointment to Brown's case, Chalu hired Dr. Berland and later Dr. Afield to assess Brown's mental status for purposes of planning both the guilt and penalty-phase defense strategies. After Alldredge became involved in the case, both Chalu and Alldredge helped Dr. Berland and Dr. Afield with data collection, including retrieval of reports as to Brown's prior psychological testing. When these mental health experts informed Chalu and Alldredge that no mental health defense was available for the guilt phase, Alldredge began working with the experts in preparing for the penalty phase. Chalu testified that he, Alldredge, and Dr. Berland interviewed family and friends of Brown in preparation for the penalty phase. Chalu testified that, by the time the trial began, he believed he and Alldredge and their investigator and experts had gathered "pretty much all the data that was available to us" concerning Brown's history.
Alldredge testified that after he was assigned to Brown's case, he first read the depositions and discussed the case with Chalu and Drs. Berland and Afield. He then met with Brown and interviewed the penalty-phase witnesses. He requested that his investigator retrieve "[e]verything and anything" as to Brown's childhood, his past criminal records, any prior mental health evaluations, and school records. Alldredge testified that finding information as to Brown's history and locating witnesses was particularly difficult and that he was not satisfied with the level of investigation provided for the penalty phase. Alldredge testified that he did not recall reviewing any of Brown's school records but that such records could have been useful during the penalty phase. Upon cross-examination, Alldredge conceded that Brown had begun school sometime after age six and had dropped out at age fourteen so that the extent of his school records would have been limited. Alldredge also testified that Dr. Berland, the most thoroughly prepared forensic psychologist he knew, did not indicate the need for further data in order to render his opinion of Brown's mental status. Alldredge testified that he did not request further neurological testing to confirm organic brain damage.[13]
During the postconviction evidentiary hearing, Brown also presented the testimony of Dr. Szabo, the psychiatrist who evaluated Brown in the Hillsborough *634 County Jail where Brown was awaiting trial in March 1986; Dr. Henry L. Dee, a psychologist who evaluated Brown in 1992 as part of an earlier postconviction effort; Dr. Jerry J. Fleischaker, a psychiatrist who evaluated Brown at a child guidance clinic in Tampa when Brown was a teenager; Dr. Fay Ellen Sultan, a clinical psychologist who evaluated Brown's mental status in 1996 for postconviction evidentiary purposes; and Dr. Berland, one of the two mental health experts who had testified at Brown's penalty phase.
Dr. Szabo testified that he diagnosed Brown as having schizophrenia, a form of psychosis, and prescribed Mellaril, an antipsychotic drug, to prevent Brown from deteriorating into a state in which he might harm others or himself while incarcerated at the jail. Dr. Fleischaker testified that he performed a psychiatric evaluation on Brown at the request of a court when Brown was about fifteen years of age, but Dr. Fleischaker did not testify as to the contents of the report. Dr. Dee testified as to his conclusion that, consistent with the opinions of Drs. Berland and Afield, Brown suffered organic brain syndrome and a longstanding major emotional disturbance manifested as schizophrenia. Dr. Sultan testified that she interviewed Brown as well as his father, stepmother, brother, and Dr. Dee, and reviewed the historical records as to Brown that were not available to Dr. Berland at the time of the trial. Dr. Sultan concluded that Brown was operating under severe and extreme psychiatric and organic mental conditions at the time of the murder. Dr. Berland testified that Brown was probably exaggerating but not malingering during his conversations with the psychologist and in his answers to test questions. Dr. Berland testified that nothing in Dr. Dee's report or Brown's 1967 presentence investigation report, neither of which were in his possession at the time of the trial, convinced him to change his findings as to Brown. Dr. Berland stated that he would not have presented the 1967 presentence investigation report to the jury because it would have documented Brown's history as a sex offender. Dr. Berland testified that access to additional collateral information would not have changed his opinion at trial that Brown was disturbed but not under extreme emotional disturbance at the time of the murder. Dr. Berland testified that additional historical information such as school records showing that Brown was a nervous child who beat his head against a table would have been helpful in conveying to the jury the nature of Brown's psychosis for purposes of the jury's weighing process during the penalty phase.
Brown also presented during the postconviction hearing the testimony of Bessie Conway, who was related by marriage to Brown and lived next door to him when he was a child in Tampa; Daniel Jackson, Brown's stepbrother; and Jimmy Lee Brown, Brown's brother. Conway testified that Brown's father once beat him with a belt. Jackson testified that Brown's father often beat Brown as well as his brother, stepbrother, sister, and mother. Jackson testified that he was contacted by an investigator prior to Brown's trial and told the investigator of the beatings and that, as a child, Brown was accused of "messing with other little kids in the neighborhood." Jackson stated that the investigator said he was not interested in finding out what Jackson meant by "messing around" and that he was not interested in pursuing Jackson as a witness. Jackson also stated that Brown's stepmother cooked for the children, helped them with their homework, and saw that they went to school. Jimmy Lee Brown testified, as he did at trial, that all the children in the family were abused. He testified that Paul Brown was beaten by his father, baby-sitters, relatives, and other children in the children's homes where the Brown children stayed when Brown's father was out driving a truck and his stepmother was incapacitated with a nervous breakdown.
After considering this evidence and argument based on this evidence, the circuit *635 court denied Brown the relief he requested in his penalty-phase ineffective assistance claims, concluding that Brown failed to meet the prejudice prong of the Strickland test. The circuit court order states in relevant part:
Most of the evidence presented addressed this [ineffective assistance] issue, but it boils down to defense counsel failing to discover an earlier "presentence investigation report," and some school records. While Mr. Alldredge expressed dissatisfaction with the level of investigation provided by his office, the records eventually located by the Defendant did not in any way change the opinion of the mental health experts and the opinion of the defense's mental health experts at the evidentiary hearing did not differ from the opinions offered at trial. The essence of the Defendant's allegation seems to be that the experts' opinions would have been given greater weight if they had additional records upon which to base their opinions at trial, but the psychologist who testified at the hearing stated that although the additional information might have been helpful, his opinion was unchanged. Counsel for the defense further claims that penalty phase counsel was ineffective for failing to call as lay witnesses family members and friends to testify concerning the Defendant's abuse as a child and low intelligence, but, in fact, two family members did testify to neglect and abuse and low intelligence....
No reasonable probability has been shown that but for deficient performance by counsel at the guilt or penalty phase, the result would have differed.
Order II at 4-5.

D. Discussion of Brown's Claims

1. Penalty Phase Investigation
As we have delineated in reviewing Brown's claims of ineffective assistance of counsel in the penalty phase of his trial, we have reviewed the trial record and the record of the postconviction evidentiary hearing. We recognize, as we did in our discussion of the guilt-phase claims, that under Strickland we must presume that counsel provided reasonable professional assistance and that Brown bears the burden of proving that such representation was unreasonable. 466 U.S. at 688-89, 104 S.Ct. 2052. Similar to Jones v. State, 732 So.2d 313 (Fla.1999), this is not a case in which trial counsel engaged in no investigation at all. The issue here is whether the investigation into mitigating circumstances undertaken by Chalu and Alldredge was so unreasonable that defense counsel "was not functioning as the `counsel' guaranteed by the Sixth Amendment." Strickland, 466 U.S. at 687, 104 S.Ct. 2052.
Brown contends in this appeal that counsel failed to provide Brown's mental health experts with a 1967 presentence investigation report and other background materials such as school records, juvenile records, or family background. Brown argues that such collateral data would have helped to refute the State's focus on Dr. Berland's statement that Brown seemed to be malingering or faking his psychiatric symptoms during interviews with the mental health experts. Actually, however, Dr. Berland only testified at trial that in his opinion Brown was exaggerating. In the postconviction hearing, he stated that he took this tendency into account when drawing his conclusions as to Brown's true mental state.
Brown also argues that the trial judge's failure to find statutory mental mitigators was due to conflicting and insubstantial penalty-phase testimony from Drs. Berland and Afield as to Brown's mental state at the time of the murder. However, both experts arrived at essentially the same conclusion: Brown was suffering from organic brain damage and psychosis, manifested as paranoia or schizophrenia. Dr. Berland testified at the postconviction hearing that he had interviewed Brown in 1986 prior to his trial and had testified in Brown's penalty phase that Brown was *636 psychotic. Also at the postconviction hearing, Dr. Berland testified that, if he had been able to review Brown's presentence investigation report and his school records before Brown's trial, "all that information would have done was to corroborate what I had already concluded, that he was psychotic."
Brown also argues ineffectiveness in that counsel did not call as lay witnesses additional family members and friends to testify concerning Brown's abuse as a child and his low intelligence. Upon their appointment to represent Brown, Chalu and Alldredge began inquiring into Brown's family history and mental state at the time of the murder. The investigator assigned to their case contacted various relatives and acquaintances of Brown. Alldredge testified that it was difficult to find and secure them as witnesses partly because the investigator assigned to Brown's case was not as aggressive as Alldredge would have preferred in uncovering Brown's history. However, Alldredge also testified that, based on conversations with potential witnesses, he made a strategic decision not to call certain lay witnesses because their testimony as to Brown's history, which included other convictions and a history as a sex offender, would have produced aggravating rather than mitigating factors. Alldredge determined that he had sufficient evidence of Brown's background even without the school records and presentencing investigation report. In view of the fact that Dr. Berland stated at the postconviction evidentiary hearing that such collateral data would not have changed his testimony, we conclude that the performance of Brown's penalty-phase counsel did not fall below the Strickland standard. See Mills v. Singletary, 63 F.3d 999, 1023-26 (11th Cir.1995).

2. Conceding Aggravators
This subclaim is procedurally barred in that Brown did not present it in his postconviction motion below. See Medina v. State, 573 So.2d 293 (Fla.1990).

3. Prosecutor's Closing Argument
Pursuant to our previous discussion in this opinion, we conclude that Alldredge was not ineffective in failing to object to the prosecutor's closing argument.

4. Prescription Drugs
We conclude that defense counsel's decision not to inform the jury that Brown was being administered antipsychotic drugs by jail personnel was strategic and did not violate the standard of Strickland. See Sims v. Singletary, 155 F.3d 1297, 1306 (11th Cir.1998).

5. Prejudice
We agree with the circuit court that Brown did not show a reasonable probability that, absent a deficient performance, the outcome at sentencing would have been different. Strickland, 466 U.S. at 695, 104 S.Ct. 2052; Bertolotti v. State, 534 So.2d 386, 389-90 (Fla.1988). The relevant facts of this case are similar to those in Breedlove v. State, 692 So.2d 874, 877 (Fla. 1997), in which two psychologists who testified at the penalty phase stated at a postconviction hearing that, although additional information from Breedlove's counsel might have been helpful, the experts' opinions were unchanged as to matters about which they had testified. Id. at 877. In Breedlove, this Court found that any deficient performance by counsel did not create the prejudice which meets the prejudice prong of the Strickland analysis. Id.
Similarly, we affirm the circuit court's ruling in this case that Brown did not demonstrate prejudice under Strickland. Based on the postconviction testimony of Brown's trial expert, Dr. Berland, we agree with the circuit court's conclusion that, even without the alleged deficient performance of trial counsel in respect to the presentence investigative report and the school records, there is no reasonable probability that the result of the penalty phase would have been different. We also *637 conclude that the circuit court was correct in its conclusion that the failure to present additional lay witnesses to describe Brown's childhood abuse and low intelligence was not prejudicial to Brown in accord with the requirements of Strickland. Such evidence would have been cumulative in that substantially the same information had been presented by other witnesses and was potentially harmful to Brown's case. As we have stated previously, we also conclude that no prejudice resulted from All-dredge's failure to object to the prosecutor's penalty-phase closing argument.
The State proved three aggravating circumstances beyond any reasonable doubt: (1) the murder was committed during commission of a felony; (2) Brown had a previous conviction of a violent felony; and (3) the murder was committed in a cold, calculated, and premeditated manner. The trial court found some points of nonstatutory mitigation (mental capacity, mental and emotional distress, social and economic disadvantage, nonviolent criminal past) but considered them of so little weight as not to outweigh even one of the aggravating factors. On this record, we conclude that Brown has failed to establish a reasonable probability that, absent the claimed errors, the sentencer would have concluded that the balance of the aggravating and mitigating circumstances did not warrant a death sentence.

Claim X. Ineffective Assistance of Counsel as to Juror Misconduct
In his tenth claim, Brown contends that his guilt-phase counsel was deficient in failing to question a juror as to the extent of her knowledge of a newspaper account of the trial. This claim is procedurally barred in that it should have been raised on direct appeal, and Brown attempts here to circumvent the procedural bar by couching the issue as ineffective assistance of counsel. See Kight v. Dugger, 574 So.2d 1066, 1073 (Fla.1990). However, the circuit judge who originally presided over these postconviction proceedings discussed the merits of this issue in his postconviction order (Order I) and found the claim to have no merit in that Brown had not proven both ineffective assistance and prejudice under Strickland.[14] As the circuit judge correctly found in his postconviction order, defense counsel made an appropriate request for the court to inquire of the jury concerning the article. Order I at 7-8. The trial court then made an inquiry as to whether any jurors had read the article or discussed it with anyone. Id. Only one juror had read the headline of the article.[15]Id. No other jurors had read the headline or the article. Id. Competent, substantial record evidence supports the trial court's factual findings concerning this issue. We find that neither ineffectiveness nor prejudice has been demonstrated pursuant to Strickland. Thus, we find no merit in this claim.

III. CONCLUSION
Accordingly, we affirm the circuit court's order denying Brown's motion for postconviction relief.
It is so ordered.
HARDING, C.J., and SHAW, WELLS and LEWIS, JJ., concur.
ANSTEAD and PARIENTE, JJ., concur in result only.
QUINCE, J., recused.
NOTES
[1] Brown raised the following claims in his postconviction motion: (1) Brown's death sentence was the product of invalid jury instructions and improper application of statutory aggravators; (2) the prosecutor's improper comments and arguments, the introduction of nonstatutory aggravators, and the court's reliance on these aggravators rendered the conviction and sentence fundamentally unfair and unreliable; (3) ineffective assistance of counsel and the prosecutor's improper argument and comment rendered the conviction and sentence fundamentally unfair and unreliable; (4) an unconstitutional automatic aggravator (felony murder) was applied; (5) sentencing was unreliable because the judge refused to find mitigation established by the record; (6) records in the possession of state agencies were withheld in violation of chapter 119, Florida Statutes, and the United States and Florida Constitutions; (7) Brown received ineffective assistance of counsel in the guilt phase because counsel failed to investigate, object, and prepare a challenge to the State's case or because the State withheld material evidence or both; (8) Brown received ineffective assistance of counsel at the penalty phase when background information was not obtained and the State failed to turn over material information; (9) Brown received ineffective assistance of counsel during voir dire in that trial counsel was rendered ineffective by the trial court's refusal to grant additional peremptory challenges; (10) penalty phase jury instructions improperly shifted the burden to Brown to prove that death was inappropriate, and failure to object rendered counsel ineffective; (11) the sentencing jury was misled by an argument that unconstitutionally diluted its sense of responsibility for sentencing; (12) Brown received ineffective assistance of counsel because counsel failed to move for mistrial regarding jury misconduct; (13) cumulative errors were not harmless; (14) rules prohibiting defense counsel from interviewing jurors to evaluate whether juror misconduct existed are unconstitutional; (15) the court erroneously instructed the jury as to the standard for judging expert testimony; and (16) execution of Brown, a mentally retarded and brain-damaged offender, would constitute cruel and unusual punishment.
[2] The court found the following rule 3.850 claims were procedurally barred because they either could have been raised on direct appeal or were raised on direct appeal and found to be without merit: claims 1, 2, 5, 11, 13, and 16. See Harvey v. Dugger, 656 So.2d 1253 (Fla.1995).
[3] The court found that claims 4, 10, and 15 were procedurally barred because Brown attempted to circumvent the procedural bar by couching the issues as ineffective assistance of counsel, see Kight v. Dugger, 574 So.2d 1066, 1073 (Fla.1990). The court also found that Brown did not adequately prove in these three claims both prongs of the test for ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[4] The court found claim 9, concerning ineffective assistance of counsel during voir dire, to be a claim that should have been raised on direct appeal and which was recast as ineffective assistance of counsel. As to claim 12, the judge attached portions of the record supporting his conclusion that Brown had not met the ineffective assistance test under Strickland in respect to ineffectiveness and prejudice in his claim that counsel was deficient in failing to voir dire a juror as to exposure to publicity during trial. The court found no merit in claim 14, arguing the unconstitutionality of Florida Rule of Professional Conduct 4-3.5(d)(4), which prohibits a lawyer from communicating with a juror regarding a trial. The judge adopted by reference the State's response, which cited Tanner v. United States, 483 U.S. 107, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987).
[5] Brown claims in this postconviction appeal that: (I) Brown's death sentence was the product of a constitutionally invalid jury instruction on the cold, calculated, and premeditated (CCP) aggravator; (II) the trial court erred in denying Brown a full and fair hearing regarding his prosecutorial misconduct claim; (III) the trial court erred in denying Brown a full and fair hearing regarding effective assistance of counsel at the guilt phase of his trial; (IV) Brown was denied effective assistance of counsel at the penalty phase of his trial; (V) Brown was denied effective assistance of counsel in the guilt phase during voir dire of prospective jurors; (VI) Brown's death sentence rests upon an unconstitutional automatic aggravating circumstance (felony murder); (VII) Brown was denied a reliable sentencing because the sentencing judge failed to find mitigation established by the record; (VIII) the trial court erred in instructing the jury that its duty was to render an advisory sentencing opinion by deciding whether mitigating circumstances were sufficient to outweigh aggravating circumstances; (IX) the trial court erred in signaling to jurors that their recommendation was of an advisory nature only and was less important than the court's decision; (X) Brown was denied effective assistance of counsel during the trial as to potential juror awareness of a newspaper account of the trial; (XI) Brown was denied a fair trial because of cumulative errors; (XII) Florida Rule of Professional Conduct 4-3.5(d)(4), which prohibited Brown's counsel from interviewing jurors to investigate claims of juror misconduct, is unconstitutional; (XIII) the trial court erroneously instructed the jury on the standard for judging expert testimony; and (XIV) the execution of Brown, a mentally retarded offender, would violate the constitutional prohibition against cruel and unusual punishment.
[6] Brown presents no claim in this Court in respect to claim 6 of the postconviction motion, in which he unsuccessfully argued at the evidentiary hearing that he was denied access to files and records in the possession of certain state agencies. As to the portion of claim 6 alleging missing evidence, Brown mentions here a missing audiotape of his confession as part of his second claim in this appeal concerning alleged prosecutorial misconduct.
[7] The following claims in this Court are procedurally barred because they either were or should have been presented on direct appeal: claims VI through IX, claims XI through XIV, and the portion of claim II that challenges the prosecutor's penalty-phase closing argument. See Urbin v. State, 714 So.2d 411, 418 n. 8 (Fla.1998). We reject without discussion that portion of claim II concerning alleged prosecutorial misconduct prior to the evidentiary hearing in that we find no abuse of discretion by the circuit judge in not disqualifying the state attorney's office. See Farina v. State, 680 So.2d 392, 395 (Fla.1996). Claim V is procedurally barred because the issue of whether Brown was entitled to additional peremptory challenges had to be raised on direct appeal and Brown has attempted to circumvent the procedural bar by couching this issue as a claim of ineffective assistance of counsel. See Valle v. State, 705 So.2d 1331, 1336 n. 6 (Fla.1997).
[8] In Jones, we recognized that to prove ineffective assistance of counsel, a defendant must show: (1) that counsel made errors so serious that counsel was not operating as the "counsel" guaranteed the defendant by the Sixth Amendment; and (2) that such deficient performance prejudiced the defense by depriving the defendant of a trial whose result was reliable. 732 So.2d at 319 (quoting Rutherford v. State, 727 So.2d 216, 219 (Fla. 1998) (quoting Strickland, 466 U.S. at 687, 104 S.Ct. 2052)). Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that rendered the result unreliable. Id.
[9] Brown's trial took place in 1987. A year later, in Jackson, this Court found that a nearly identical argument by Benito was not misconduct so egregious that it tainted the jury's recommendation. 522 So.2d at 809. In Hudson, this Court found no reversible error in a similar argument by Benito. 538 So.2d at 832 n. 6. Four years after Brown's trial, this Court remanded for resentencing in Taylor after finding the trial court's allowing the same argument by Benito to be harmful error. 583 So.2d at 330. However, subsequently, this Court found in Hodges that allowing the same argument was harmless error. 595 So.2d at 934.
[10] See Sims v. Singletary, 155 F.3d 1297, 1306-07 (11th Cir.1998); Davis v. Singletary, 119 F.3d 1471, 1477 (11th Cir.1997); Spaziano v. Singletary, 36 F.3d 1028, 1039 (11th Cir.1994), in which the federal courts held that counsel's decisions as to trial strategy and tactics were within the bounds of reasonably competent representation.
[11] In count three of this same indictment, Brown was charged attempted first-degree murder for this offense. The jury convicted him as charged on count three.
[12] The record indicates that Brown's age was 36 at the time of the murder.
[13] Dr. Berland testified in the postconviction hearing that he did not recommend a CAT scan for Brown because this neurological test was imprecise in measuring organic brain damage and, if the test showed no brain damage, that result could be used against Brown at trial. Dr. Berland testified that a PET scan was not recommended because, at the time of Brown's trial in 1987, the test was not available in Hillsborough County, and furthermore, no research data existed at the time as to how to interpret the test. Dr. Berland testified that the PET scan was not widely accepted until recently and still is not approved by the Food and Drug Administration as a medical diagnostic tool.
[14] This was claim 12 in Brown's rule 3.850 motion.
[15] The record reflects that on the third day of trial defense counsel requested that the judge question jurors as to their knowledge of a newspaper article containing information about the trial and about other crimes for which Brown had been charged but not convicted. One alternate juror admitted that she had "read at it." When the trial judge asked her whether she had read anything pertaining to Brown's case, she responded, "Only the headline."