937 So.2d 612 (2006)
Anthony Joseph FARINA, Appellant,
v.
STATE of Florida, Appellee.
Anthony Farina, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC04-1610, SC05-935.
Supreme Court of Florida.
July 6, 2006.
*616 John W. Jennings, Capital Collateral Regional Counsel, Marie-Louise Samuels Parmer and Mark S. Gruber, Assistant CCR Counsel, Middle Region, Tampa, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL and Kenneth S. Nunnelley, Senior Assistant Attorney General, Daytona Beach, FL, for Appellee/Respondent.
PER CURIAM.
Anthony Farina, a prisoner under sentence of death, appeals an order of the circuit court denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.851. Farina also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. As we explain below, we affirm the denial of Farina's postconviction motion and deny the habeas petition.

I. FACTUAL AND PROCEDURAL BACKGROUND
After a Taco Bell restaurant closed early on May 9, 1992, Jeffrey and Anthony Farina confronted Michelle Van Ness, 17, and Derek Mason, 16, while the two employees were emptying trash.[1] Jeffrey had a .32-caliber pistol, Anthony carried a knife and rope, and both wore gloves.[2]
The Farinas ordered Van Ness and Mason into the restaurant, where they rounded up two other employees. Jeffrey held three employees at gunpoint while Anthony forced employee Kimberly Gordon, 18, to open the safe and hand over the day's receipts. The Farinas then tied the employees' hands, and Anthony forced them into a walk-in freezer. Jeffrey then shot Mason in the mouth. He also shot employee Gary Robinson, 19, in the chest and Van Ness in the head, and stabbed Gordon in the back. The Farinas fled the restaurant, but were arrested later that day. Van Ness died on May 10. The Farinas were charged with first-degree murder and six other offenses.
The jury found Anthony guilty of first-degree murder. At the penalty phase, the jury recommended death by a vote of seven to five. The trial judge followed the recommendation, finding five aggravators and minimal nonstatutory mitigation. On appeal, Anthony raised ten issues. We affirmed the convictions and sentences for the noncapital offenses, but we vacated the *617 death sentence and remanded for a new sentencing proceeding because the trial court erroneously excused for cause a prospective juror who was qualified to serve. See Farina, 679 So.2d at 1157-58.
On remand, a joint penalty proceeding was held before a new jury. The jury unanimously recommended the death penalty for both Anthony and Jeffrey. Regarding Anthony, the trial judge found five aggravating factors, three statutory mitigating factors, and fifteen nonstatutory mitigating factors.[3] Following the jury's recommendation, the judge concluded that the aggravating factors far outweighed the mitigating factors and imposed the death penalty.
Anthony appealed, but we denied all claims and affirmed the death sentence. In April 2003, Anthony filed a rule 3.851 motion for postconviction relief, raising thirteen claims. The circuit court denied relief on all of them. Anthony now appeals the court's order denying relief. He raises six issues, several of which contain additional subparts. He also petitions this Court for a writ of habeas corpus, raising four claims.

II. APPEAL OF DENIAL OF 3.851 RELIEF
Of Anthony's various claims, we address only a few. Many of his claims are procedurally barred or legally insufficient, and therefore we deny them without discussion.[4]See Johnson v. State, 593 So.2d 206, 208 (Fla.1992) ("Issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack."). Claim 6 (cumulative errors deprived Anthony of a fair trial) presents a conclusory argument insufficient to state an issue. See LeCroy v. Dugger, 727 So.2d 236, 240 (Fla.1998) (upholding the summary denial of a postconviction motion because the defense alleged no facts to substantiate its conclusory *618 claims of ineffective assistance of counsel); see also Randolph v. State, 853 So.2d 1051, 1063 n. 12 (Fla.2003) ("[T]he purpose of an appellate brief is to present arguments in support of the points on appeal.") (quoting Duest v. Dugger, 555 So.2d 849, 852 (Fla. 1990)). Other claims are clearly meritless.[5] Finally, some claims were raised on direct appeal and we decided them against Anthony.[6] We address Anthony's remaining three arguments, corresponding to claims 1(a), 1(b), and 3(c). These are: (A) that Jeffrey's life sentence is newly discovered evidence that warrants granting Anthony a new sentencing phase; (B) that the evidentiary hearing testimonies of four witnesses should exculpate him; and (C) that his counsel provided ineffective assistance for failing to investigate and present evidence of Jeffrey's history of aggression and violence and domination of Anthony.

A. Jeffrey's Life Sentence
Anthony first claims that Jeffrey's life sentence is newly discovered evidence that warrants granting him a new sentencing phase. During resentencing in 1998, a jury unanimously recommended the death penalty for Anthony and Jeffrey. We later vacated Jeffrey's death sentence and reduced it to life imprisonment without the possibility of parole for twenty-five years because he was 16 years old at the time of the crimes. See Farina v. State, 763 So.2d 302, 303 (Fla.2000) (citing Brennan v. State, 754 So.2d 1 (Fla.1999)).
The circuit court construed this argument as a proportionality claim, which we rejected on direct appeal. See Farina v. State, 801 So.2d 44, 55-56 (Fla.2001). Thus, any such argument here would be procedurally barred. See Turner v. Dugger, 614 So.2d 1075, 1078 (Fla.1993) (barring claims for postconviction relief "because they, or variations thereof, were raised on direct appeal").
Nevertheless, Anthony insists that Jeffrey's life sentence is "newly discovered evidence." To set aside a conviction based on newly discovered evidence,
[f]irst ... the evidence "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence."

*619 Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.
Robinson v. State, 865 So.2d 1259, 1262 (Fla.2004) (citation omitted) (quoting Jones v. State, 709 So.2d 512, 521 (Fla.1998)). "The two elements of a newly discovered evidence claim apply equally to the issue of `whether a life or death sentence should have been imposed.'" Ventura v. State, 794 So.2d 553, 571 (Fla.2001) (quoting Scott v. Dugger, 604 So.2d 465, 468 (Fla. 1992)). Therefore, to succeed on a claim that a death sentence must be set aside because of a codefendant's subsequent life sentence the defendant must show: "1) the life sentence could not have been known to the parties ... at the time of trial; and 2) the codefendant's life sentence would probably result in a life sentence for the defendant on retrial." Id. (quoting Groover v. State, 703 So.2d 1035, 1037 (Fla.1997)). In Scott, we held that a codefendant's subsequent life sentence constitutes newly discovered evidence which would permit collateral relief. 604 So.2d at 468-69. We further held that "in a death case involving equally culpable codefendants the death sentence of one codefendant is subject to collateral review under rule 3.850 when another codefendant subsequently receives a life sentence." Id. at 469.
Anthony meets the first prong of the newly discovered evidence test because we reduced Jeffrey's sentence two years after they were sentenced to death. See Farina, 763 So.2d at 303. However, Anthony fails to meet the second prong. Although Jeffrey's life sentence would normally constitute newly discovered evidence under Scott, we reduced his sentence because he was not eligible as a matter of law to receive the death penalty. See Farina, 801 So.2d at 56 (citing Brennan, 754 So.2d at 5-6). Thus, as we stated in Anthony's direct appeal, Jeffrey's life sentence "is irrelevant to Anthony's proportionality review because the aggravation and mitigation in their cases are per se incomparable." Id. Jeffrey's life sentence would not "probably result in a life sentence for [Anthony] on retrial." See Ventura, 794 So.2d at 571.
The dissent insists that the reason for Jeffrey's reduction in sentence is irrelevant. Dissenting op. at 636. It argues that "[t]here is simply no meaningful distinction between [Anthony's] claim here and the decision in Scott." Id. at 636. We disagree. The mitigating "evidence" that Anthony sought to introduceJeffrey's life sentencewas not relevant to Anthony's character, his background, or the circumstances of the crime. We recognize a defendant's right to "present any [mitigating] circumstance to a jury or judge for consideration as a reason to spare his life." Dissenting op. at 636 (citing Smith v. Texas, 543 U.S. 37, 44, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004)). As with all evidence, however, mitigating evidence must meet a threshold of relevance. Although the threshold is low, the evidence must tend "logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." Id. (quoting Smith v. Texas, 543 U.S. 37, 44, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004) (quoting Tennard v. Dretke, 542 U.S. 274, 284, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004))). In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court held that the sentencer must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Id. at 604, 98 S.Ct. 2954 (plurality opinion). Yet we have held that Lockett requires the "admission of evidence that establishes facts relevant to the defendant's character, his prior record, *620 and the circumstances of the offense in issue." Hess v. State, 794 So.2d 1249, 1269 (Fla.2001) (emphasis added) (quoting Herring v. State, 446 So.2d 1049, 1056 (Fla. 1984)).
In this case, Jeffrey's life sentence does not meet this low threshold for relevance. In Scott, this Court vacated a codefendant's death sentence and remanded for a new sentencing proceeding before a jury. 604 So.2d at 468 (citing Robinson v. State, 487 So.2d 1040 (Fla.1986)). Upon the jury's recommendation, the codefendant was resentenced to life. Id. In this case, Jeffrey, too, originally received a death sentence. Farina, 763 So.2d at 303. As the dissent notes, the jury recommended death by a vote of nine to three, and the judge found five aggravating circumstances, including HAC and CCP. Farina v. State, 680 So.2d 392, 394 (Fla.1996). The reason he did not receive the death penalty, however, had nothing to do with the circumstances of the crime or the presence or absence of aggravating or mitigating factors. The basis was purely legal: we had held in Brennan, 754 So.2d at 1, that the imposition of a sentence of death on a sixteen-year-old defendant constitutes cruel and unusual punishment, and Jeffrey was sixteen years old at the time of these murders. See Farina, 763 So.2d at 303 (citing Brennan, 754 So.2d at 5-6). Thus, whereas in Scott, a jury analyzed the facts and, considering the aggravating and mitigating circumstances, recommended a sentence of life, in this case, despite a jury recommendation of a sentence of death, and the trial court's imposition of such a sentence, this Court concluded as a matter of law that Jeffrey was ineligible for the death penalty. See id. Unlike Scott, Jeffrey's sentence reduction has no connection to the nature or circumstances of the crime or to the defendant's character or record. Under Lockett, it is irrelevant as a mitigating circumstance in Anthony's case.
We have held that a defendant fails to prove that his codefendant's life sentence would "probably produce" an acquittal or life sentence on retrial when the codefendant was less culpable. See, e.g., Marquard v. State, 850 So.2d 417, 423-24 (Fla. 2002) (affirming the defendant's death sentence even though his codefendant received a life sentence, because the defendant was more culpable); Ventura, 794 So.2d at 571 (denying the defendant's claim because he was the triggerman in the scheme and his codefendant was not equally culpable); Groover, 703 So.2d at 1037 (affirming the denial of the defendant's newly discovered evidence claim because the defendant and codefendant were not equally culpable). In this case, although Jeffrey was the triggerman, the basis for Jeffrey's reduction in sentence hinders Anthony's ability to satisfy the second prong of the test. If Anthony were allowed to introduce Jeffrey's life sentence, the State would be entitled to rebut the relevance of that evidence by showing that the sentence was not the result of a jury recommendation or a trial court's judgment but a matter of law. The evidence is certainly not so strong that it would "probably result in a life sentence" for Anthony. Accordingly, we deny this claim.

B. Evidentiary Hearing Testimony
In his second claim, Anthony alleges that the evidentiary hearing testimonies of four witnesses should exculpate him. At the hearing, trial counsel testified that his theory for Anthony's defense stressed that Anthony was not the active participant in the crimes: "He was not the one who fired the fatal shot .... and ... was not the one who wielded the knife." The testimonies of these witnesses, he argues, are newly discovered evidence proving that Jeffrey was the leader and the more violent *621 and aggressive of the two brothers. The witnesses in question are Jeffrey, Susan Griffith (Anthony and Jeffrey's mother), Katrina Bergenty (Anthony and Jeffrey's sister), and Dr. Clifford Levin (a psychologist who evaluated Anthony).
At the hearing, Jeffrey testified that he and Anthony did not have "any defined older/younger brother attitude." They were "[a]lmost like equals." He stated, "If one of us wanted the other to do something... we would ask them." He never made Anthony do anything, although, in late 1991, he decided for Anthony that they would not move with their mother to Georgia. He also got a job for Anthony and helped him with work. In addition, Jeffrey testified that he "could be very violent." "One minute [he] could be laughing and joking and the next minute [he] could ... just start swinging on people." Anthony, however, was "[v]ery laid back." Jeffrey refused to describe Anthony as the "mastermind" behind the crimes, which they never planned in great detail. Anthony did approach him about committing a robbery. Anthony asked him if he could borrow a knife, but Jeffrey refused. Jeffrey admitted that Anthony originally planned to rob the Taco Bell with someone else. Anthony had been an employee there and was familiar with its procedures and employees. Nevertheless, Jeffrey became involved, but they never discussed their roles.
On cross-examination, Jeffrey testified that, when they arrived at the Taco Bell, Anthony went inside to see who was working. After he returned to the car, Jeffrey suggested cutting or injuring himself and using that as a way to get inside. Anthony advised against it because the employees would call the police, and Jeffrey agreed. Jeffrey stated, however, that he felt like he was in charge because, at one point, Anthony wanted to leave and Jeffrey persuaded him to stay. When they restrained Van Ness and Mason outside the restaurant, Jeffrey pointed a gun at one of them, and Anthony pointed a knife at the other. After gathering them with the other two employees inside, Jeffrey watched three of them while Anthony went with the manager to get the money. Jeffrey testified that Anthony "knew where the money was kept, it's logical he would go get it." Anthony returned with the money in canvas bank bags. Jeffrey told him to take it out of the bags, and he complied. They then took turns tying up the employees and told them to sit on the floor while they went into the manager's office. Anthony was worried that the employees could identify him. Jeffrey offered to shoot them, and Anthony told him it was his decision. Jeffrey stated that Anthony could not have stopped him.
Jeffrey told Anthony to move the employees into the freezer, and Anthony complied. Jeffrey followed them into the freezer while Anthony remained behind him. Jeffrey then fired three shots until the gun failed. He turned around, took the knife from Anthony, and stabbed one of the female employees twice. He stated that Anthony remained behind him but never attempted to stop him. Afterward, they walked out to the car, and Jeffrey directed Anthony to drive to "Park's" where he could dispose of the rope, gloves, gun and knife. Jeffrey decided they would tell their mother that they were at a party, and Anthony relayed that story to her.
Griffith testified that Anthony was "more of a follower" while Jeffrey was more of a leader. Jeffrey "would get mad faster, and Anthony would ... let him have his way." She also stated that Jeffrey used to own a gun and was "fascinated" with knives and "collect[ed] large knives." By contrast, Anthony had no interest in weapons. On cross-examination, *622 Griffith admitted that Jeffrey received counseling for his temper, which he became able to control for about a year and a half before the crimes. Nevertheless, Jeffrey punched things when he was angry, whereas Anthony never had such problems.
Bergenty testified that Anthony was "laid back" while Jeffrey was "more serious or not as laid back." Jeffrey "had a shorter temper," and Anthony "had a longer fuse before he [got] upset." He was "easygoing ... instead of arguing ... he just went along with [Jeffrey]." She believed Jeffrey was "more a leader." On cross-examination, she clarified that Anthony was not afraid of Jeffrey.
Dr. Levin evaluated Anthony in 1992 and 1998 in preparation for penalty phase testimony. Before the evidentiary hearing, Dr. Levin also interviewed Jeffrey and reviewed the record of Jeffrey's psychologist. He concluded that Anthony was suffering from "Dependent Personality Disorder." He stated that Anthony "had an immature personality, a tendency to defer to others, withdraw into his family, ... a lack of ... a good sense of himself." He found that Jeffrey described himself as someone Anthony would defer to for major decisions. In addition, Jeffrey "had a relationship with [Anthony] of interdependence and aggression." Anthony "defer[red] to his brother in order to maintain peace."
Dr. Levin added that Anthony "made some independent thoughts in planning this robbery, but ... was the more passive... dependent personality." He believed that Anthony had difficulty planning and initiating the robbery and concluded that "there was substantial domination of Jeffrey over Anthony." "[T]he murder and attacks ... would not have taken place if Anthony was acting alone." Furthermore, Anthony had "difficulty making everyday decisions .... difficulty ... expressing disagreement." "[H]is decision making is not autonomous."
Anthony argues that the circuit court erred in discrediting these testimonies. We disagree. The relevant standards are the requirements for newly discovered evidence. See Robinson, 865 So.2d at 1262 ("First ... the evidence `must have been unknown ... at the time of trial ....' Second, the ... evidence must be of such nature that it would probably produce an acquittal on retrial.") (citation omitted). In addition, "the trial court is required to `consider all newly discovered evidence which would be admissible' at trial and then evaluate the `weight of both the newly discovered evidence and the evidence which was introduced at the trial.'" Id. (emphasis added) (quoting Jones, 709 So.2d at 521). When reviewing a court's application of the above law to a rule 3.850 motion following an evidentiary hearing, we apply the following standard of review: "As long as the trial court's findings are supported by competent substantial evidence, [we] will not substitute [our] judgment... on questions of fact, likewise of the credibility of the witnesses...." Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997) (citation and internal quotation marks omitted).
In denying relief, the circuit court found the testimonies of Jeffrey, Griffith, Bergenty, and Dr. Levin to be "incredible" because they contradicted the testimonies of the three surviving victims at resentencing. The victims in question were Derek Mason, Kimberly Gordon, and Gary Robinson. Mason testified that, once Anthony and Jeffrey brought them inside the restaurant, "Anthony said, go inside and get the manager." He also stated that Anthony offered to let them smoke and directed those who were not smoking to stand so that their hands could be tied. Mason said *623 that "Anthony pretty much told Jeffrey what to do." Gordon, the manager on duty, testified that, when she saw Anthony and Jeffrey holding Mason and Van Ness, Anthony ordered them to the back of the restaurant. Anthony then told her that he knew she had the keys to the safe and ordered her to go to the front of the restaurant with him to get the money. Like Mason, Gordon also stated that Anthony offered to let them smoke and directed those who were not smoking to go with him. When asked who did most of the talking, Gordon replied, "Anthony was doingI never heard Jeffrey talk." To her, "[i]t appeared that Anthony was in charge .... [b]ecause he did all of the talking." She added that Anthony directed them into the freezer. Robinson also stated that Anthony led them into the freezer. When asked who he thought was in charge, Robinson replied, "Anthony was doing most of the talking."
Given this testimony at resentencing, the trial court found as follows:
[T]he Court finds the exculpatory evidence... to be incredible. The defendant's brother has clear motive to fabricate or exaggerate now that he no longer faces the death penalty. On the other hand, if there was any reason for the victims [at resentencing] to contrive their testimony to prejudice one brother over the other, it would be contrived against Jeffrey.... Yet the victims testified without exception that it was the defendant who was in charge.
After weighing all the evidence, the Court finds that there is no probability that the defendant would receive a recommendation of life from a jury upon retrial.
The record shows that the circuit court properly applied the above law. Competent, substantial evidence supports its findings. Consequently, we cannot substitute our judgment for that of the court on this matter. We find no error.

C. Ineffective Assistance of Counsel
In his third claim, Anthony alleges ineffective assistance of trial counsel for failure to investigate and present evidence of Jeffrey's history of aggression and violence and domination of Anthony. The standard from Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), governs this claim: "First, the defendant must show that counsel's performance was deficient.... Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Valle v. State, 778 So.2d 960, 965 (Fla.2001) (quoting Strickland, 466 U.S. at 687, 104 S.Ct. 2052). To establish deficiency, the defendant must prove that "counsel's representation was unreasonable under prevailing professional norms." Id. (quoting Brown v. State, 755 So.2d 616, 628 (Fla.2000) (quoting Strickland, 466 U.S. at 688-89, 104 S.Ct. 2052)). To establish prejudice, the defendant "must show ... a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 965-66 (quoting Williams v. Taylor, 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052)).
Anthony argues that the testimonies of Susan Griffith (his mother) and Tina O'Neill (a family friend) at the evidentiary hearing demonstrate Jeffrey's history of aggression and dominance of Anthony. Anthony argues that this evidence "would have established nonstatutory mitigation *624 that [he] acted under the domination of his brother ... or even the statutory mitigating circumstance that [he] acted under extreme duress or the substantial domination of Jeffrey."
At the hearing, Griffith testified that Anthony was "more of a follower" while Jeffrey was more of a leader. She also stated that, unlike Anthony, Jeffrey was "fascinated" with knives. O'Neill testified that Anthony was quiet while Jeffrey could be aggressive or violent. She added that "there were times ... where [Jeffrey] would have ... this dark side." When this happened, she said, "he would ... get an attitude. He ... deliberately pick[ed] fights with somebody or ... would ... storm out of the house." He picked fights with Anthony and usually won. She recounted certain instances in which Jeffrey punched walls and doors. She also stated that, unlike Anthony, Jeffrey owned a gun and collected knives. She concluded that "Jeffrey usually was the leader." Anthony usually gave in to his wishes.
Griffith's testimony and portions of O'Neill's testimony are cumulative to the evidence presented at the resentencing. We have held that counsel does not render ineffective assistance by failing to present cumulative evidence. See Cole v. State, 841 So.2d 409, 425 (Fla.2003) (holding that additional witnesses were not needed to corroborate the defendant's drug abuse problems because counsel had already introduced sufficient evidence of drug use) (citing Valle v. State, 705 So.2d 1331, 1334-35 (Fla.1997)); Marquard, 850 So.2d at 429-30 (failure to call additional witnesses to testify about the defendant's drug problems and child abuse was not ineffective assistance of counsel, where defense counsel had introduced this information through their expert witness).
At the resentencing, trial counsel introduced through several witnesses evidence of Jeffrey's aggression and dominance. He simply did not rely exclusively on Griffith and O'Neill. At the time, Griffith testified about Jeffrey's interest in knives and weapons. Dr. Levin testified extensively about Anthony's "dependent personality disorder." He stated that Anthony had "difficulty making everyday decisions... relies on others to make decisions .... needs others to assume responsibility ...." He also noticed a "pattern throughout his childhood and adolescence of avoiding conflict... avoiding making decisions" and "difficulty initiating projects." In addition, he explained that Anthony "stays very much dependently involved" in a relationship, and his "pattern of behavior is passivity." Counsel also called on Dale Heiser (the police officer who investigated Anthony's child abuse claim in 1987), who opined that Jeffrey was more of the leader and "the instigator." In addition, Tammy Lewis (Anthony's former girlfriend) testified that Jeffrey was more daring while Anthony tried to lead him away from trouble. Finally, Dr. Harry Krop testified that, during the robbery, Anthony deferred to Jeffrey's wishes for tying up the victims, forcing them into the freezer, and shooting them.
The only information not accounted for are the portions of O'Neill's testimony at the hearing discussing Jeffrey's aggression, "dark side," attitude, and tendency to pick fights. However, the rest of O'Neill's testimony, as well as Griffith's testimony, is cumulative. Having called on Heiser, Lewis, Dr. Levin, Dr. Krop, and even Griffith at resentencing, counsel probably elected not to introduce additional testimony to corroborate Jeffrey's aggression and dominance. Like the attorneys in Cole and Marquard, counsel did not render ineffective assistance.
Although the remainder of O'Neill's testimony at the hearing was not *625 cumulative, Anthony still cannot demonstrate prejudice. In denying relief, the circuit court relied on the victims' testimony during resentencing and found it more credible than the testimonies of Griffith and O'Neill. The court stated: "All of the victims testified that [Anthony], who did all or almost all of the talking at the crime scene, was in charge." This consistent and coherent presentation of Anthony's role stands in sharp contrast to O'Neill's testimony about Jeffrey's aggression and violence. Even if the jury were to find O'Neill's testimony more credible than the victims' testimonies, the additional mitigation established would not have outweighed the aggravating circumstances, of which two (HAC and CCP) were among "the most serious aggravators set out in the statutory scheme." Larkins v. State, 739 So.2d 90, 95 (Fla.1999). There is no reasonably probabilityone sufficient to undermine our confidencethat O'Neill's testimony would have affected the jury's unanimous recommendation of the death penalty. Because we determine that no prejudice resulted from counsel's failure to introduce these portions of O'Neill's testimony, we need not consider whether counsel provided deficient performance. See Pietri v. State, 885 So.2d 245, 256 (Fla. 2004) ("[A] court considering a claim of ineffectiveness of counsel `need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.'") (quoting Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986)). Accordingly, we deny relief.

III. PETITION FOR WRIT OF HABEAS CORPUS
Anthony also petitions this Court for a writ of habeas corpus, raising four claims. The first of these claims contains several subparts. However, most of these issues are procedurally barred or legally insufficient, and therefore we deny them without discussion.[7] Other claims present merely conclusory arguments insufficient to state an issue.[8]See Asay v. Moore, 828 So.2d 985, 990 (Fla.2002) (holding a claim procedurally *626 barred because it was insufficiently pled as the petitioner failed to phrase the argument as ineffective assistance of appellate counsel); Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000) ("The defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based."). Finally, claim 2 (ineffective assistance of appellate counsel for failure to allege that Florida Rule of Professional Conduct 4-3.5(d)(4), which prohibits juror interviews, is unconstitutional), is clearly meritless. See Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994) ("`Where a particular legal argument, had it been argued [on appeal], would in all probability have been found without merit, the omission to raise it will not be deemed a deficiency' such as to constitute ineffective assistance of appellate counsel.") (quoting Thomas v. Wainwright, 495 So.2d 172, 174 (Fla.1986), cert. denied, 480 U.S. 911, 107 S.Ct. 1360, 94 L.Ed.2d 530 (1987)).
Anthony's remaining argument is ineffective assistance of appellate counsel for failure to raise a claim of prosecutorial misconduct based on the introduction of biblical authority. To establish a claim of ineffective assistance of appellate counsel, Anthony must demonstrate:
(1) specific errors or omissions which show that appellate counsel's performance deviated from the norm or fell outside the range of professionally acceptable performance and (2) the deficiency of that performance compromised the appellate process to such a degree as to undermine confidence in the fairness and correctness of the appellate result.
Wilson v. Wainwright, 474 So.2d 1162, 1163 (Fla.1985). Anthony claims that appellate counsel erred in failing to claim prosecutorial misconduct (A) during the cross-examination of Reverend James Perry Davis, a defense witness, at resentencing, and (B) during closing argument.

A. Cross-Examination of Reverend Davis
Anthony first argues that appellate counsel failed to claim prosecutorial misconduct during the cross-examination of Davis. Anthony claims that, during his cross-examination of Davis, the prosecutor elicited biblical authority that supported the imposition of the death penalty.[9] The relevant portions of the prosecutor's cross-examination are reproduced below:
Q: You formed some pretty strong opinions about these young men.... I believe there's sincerely hell.... [D]id you rely ... upon your observations and experience, or did you put any thought... into how they stacked up according to the Bible?
A: By the Bible's word, that and my emotion, because they were repentant to me for the crime[s] ... they ... committed.... I saw signs of that in their actions ... their verbalization, ... their *627 emotions, and in their feelings. And to me that's the way I can look at something and tell whether it's what it says it is ....
Q: But as a man of God, you certainly don't make real serious [judgments] or considerations without holding up your opinion to maybe God's standard and his word? Is that part of
A: I'm definitely not God....
Q: [Y]ou put heavy reliance upon the Bible, don't you?
A: Yes, I do.
Q: What is the Bible to you?
A: It's the infallible word of God, inspired word of God that God gave to us as our ....
Q: But from my understanding of the Bible, is men actually wrote the words down and you say it's the word of God?
A: Inspired by the Holy Spirit, right.
Q: Are you familiar with the Book of Romans? Do you know who wrote it?
A: Paul, Apostle Paul.
Q: What happened to Paul ultimately?
A: Paul was killed ultimately.
Q: By the Roman government?
A: Uh-huh....
Q: And even though Paul was a prisoner of the Roman government, he wrote a very significant book called the Romans; did he not?
A: Yes, he did.
Q: Are you familiar with the first of seven verses of Romans thirteen?
A: Yes. About honoring authority, submitting to authority. The judge and the prosecutor and the defense attorneys all work for God and are ordained by God as being the authority and in the positions that they are and if theyGod is the one that allows them to be there.
Q: Well, I don't want to say that defense attorneys aren't saved. But they're not the authorities, are they, they are defense lawyers versus the prosecutor?
A: Right.
MR. TANNER: Your honor, may I hand him something to help with his memory as well?
MR. HATHAWAY: Your honor, I don't know what he's tendered to the witness.
MR. TANNER: Romans.
THE WITNESS: It's a copy of the Bible, scripture out of the Bible.
MR. TANNER:
Q: What does Romans one and two say about authority under God's law?
MR. HATHAWAY: Perhaps he can show the relevancy of this. I don't know why we are referring to this at this time.
THE COURT: What
MR. HATHAWAY: Relevance objection.
MR. TANNER: You[r] honor, I will link it up when I lay the foundation. I believe you will see the relevancy as we
THE COURT: To this witness' testimony, not just a philosophical or religious discussion?
MR. TANNER: No, sir.
THE COURT: This is specific testimony?
MR. TANNER: Yes. It will relate directly to this witness' testimony.
THE COURT: Connect it up. And, Mr. Hathaway, if it's not properly connected up, go ahead and renew your objection.
THE WITNESS: Read verse one and two?
MR. TANNER:

*628 Q: Yes, sir.
A: Everyone must submit himself to the governor of authorities for there is no authority except for which God has established. The authorities that exist have been established by God. Consequently, he who rebels against the authority is rebelling against what God has instituted. And those who do so will bring [judgment] on themselves.
Q: The next verse deals with the prosecutor; does it not? What does it say?
A: For the rulers hold no terror for those who do right, but for those who do wrong. Do you want to be free from fear that the one in authority and do what is right and you will ... he will commend you.
Q: And the next verse?
A: Where he is God's servant to do your good, but if you do wrong, be afraid for he does not bear the sword for nothing. He is God's servant and agent to wrath, to bring punishment to the wrongdoer.
Q: And the next?
A: Therefore, it is necessary to submit to the authorities not only because of the possible punishment, but also because of your conscience....
Q: Is there anything in scripture that you find that says the laws and the government should excuse crimes because someone is repentant?
A: Specifically the law and government, no.
Q: Tells us as Christians forgive one another?
A: Yes.
Q: But that's not inconsistent with the government's responsibility to uphold the law and bring the punishment which-and the word of the Lord, that you have just read, that bring [judgment] on themselves; is that correct?
A: That's correct....
Q: [W]hen Christ was on the cross there was a condemned felon beside him that repented and accepted Christ; is that right?
A: That's right.
Q: But he didn't take that felon off the cross or forgive the death penalty, did he?
A: No.
Q: He said he would see him in paradise.
A: Yeah....
Q: Christ died for sinners.
A: Yes.
Q: And Paul died because of Christ?
A: Yes.
Q: Is there anything inconsistent with that. That these men face the death penalty for the murder of a seventeen-year-old-girl?
A: No.
The first issue we must address is whether a claim of prosecutorial misconduct was preserved for appeal. To preserve an issue, "[f]irst, a litigant must make a timely, contemporaneous objection. Second, the party must state a legal ground for that objection. Third ... `it must be the specific contention asserted as legal ground for the objection ... below.'" Harrell v. State, 894 So.2d 935, 940 (Fla. 2005) (quoting Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982)). Defense counsel objected to the introduction of the Bible based on relevance. The dissent claims that this objection "was clearly valid." Dissenting op. at 640 n. 15. We agree with that contention as far as it goes. However, the issue Anthony argues before us now (prosecutorial misconduct) is not "the specific contention asserted as legal ground for the objection ... below." Harrell, *629 894 So.2d at 940. At trial, defense counsel never argued that the prosecutor was engaging in misconduct. Therefore, it was not preserved for appeal.
Furthermore, the issue also was not preserved because defense counsel did not obtain a ruling on the motion at trial. As we have held, the failure to obtain a ruling on a motion or objection fails to preserve an issue for appeal. Armstrong v. State, 642 So.2d 730, 740 (Fla.1994) (holding that the defendant's pretrial request for a Magnetic Resonance Imaging (MRI) test was procedurally barred because the trial judge reserved ruling on the issue and never issued a ruling) (citing Richardson v. State, 437 So.2d 1091, 1093 (Fla.1983)). When defense counsel objected, the trial court reserved judgment, allowed the prosecutor to illustrate the relevance of the Bible, and alerted the defense that it could renew its objection if the prosecutor's subsequent questioning failed to relieve its concerns. Defense counsel did not renew his objection at that time, and the court never ruled. Therefore, this issue was not preserved.
We have held that "[a]ppellate counsel has no obligation to raise an issue that was not preserved for review and is not ineffective for failing to raise an unpreserved issue on appeal." Zack v. State, 911 So.2d 1190, 1204 (Fla.2005) (citing Randolph, 853 So.2d at 1068). Anthony failed to preserve this issue of prosecutorial misconduct. Therefore, appellate counsel was not ineffective for failing to raise it on direct appeal.
Nevertheless, Anthony argues that the prosecutor's conduct was fundamental error. "[A]ppellate counsel may not be deemed ineffective for failing to challenge an unpreserved issue on direct appeal unless it resulted in fundamental error." Hendrix v. State, 908 So.2d 412, 426 (Fla.2005) (citing Rutherford v. Moore, 774 So.2d 637, 646 (Fla.2000)).
The critical issue then is whether the prosecutor's conduct represents fundamental error. "Fundamental error" is the sole exception to the preservation requirement. Harrell, 894 So.2d at 941. To be fundamental, an error must "reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Id. (quoting Brown v. State, 124 So.2d 481, 484 (Fla.1960)). We have also defined it as "error which goes to the foundation of the case." Ray v. State, 403 So.2d 956, 960 (Fla.1981) (quoting Sanford v. Rubin, 237 So.2d 134, 137 (Fla.1970)). We have cautioned appellate courts to "exercise their discretion concerning fundamental error `very guardedly.'" Id. "[F]undamental error should be applied only in the rare cases where a jurisdictional error appears or where the interests of justice present a compelling demand for its application." Id. "Specifically, prosecutorial misconduct constitutes fundamental error when, but for the misconduct, the jury could not have reached the verdict it did." Miller v. State, 782 So.2d 426, 432 (Fla. 2d DCA 2001). We now apply these standards to the prosecutor's conduct.
We have condemned the invocation of religious authority in capital sentencing proceedings. Contrary to the dissent's belief, however, there is no categorical rule prohibiting it. Instead, we have reasoned that "[c]ounsel should not be so restricted in argument as to prevent references by way of illustration to principles of divine law ... as may be appropriate to the case. This is a matter within the discretion of the trial judge ...." Street v. State, 636 So.2d 1297, 1303 (Fla.1994) (emphasis added) (quoting Paramore v. State, 229 So.2d 855, 860-61 (Fla.1969), vacated in part on *630 other grounds, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751 (1972)). We have cautioned, however, that "trial judges and attorneys should refrain from discussing religious philosophy in court proceedings." Ferrell v. State, 686 So.2d 1324, 1328 (Fla. 1996).[10] Yet we have rarely found that such conduct rises to the level of fundamental error.
In Street, for example, we held that a prosecutor's "references to and quotes from the Bible" during closing argument were not fundamental error. 636 So.2d at 1303. The prosecutor asked the jury: "Should we excuse the sinner? Should we thank the sinner? Is that our job; is that our obligation under the law?" Id. We agreed that these statements were not objectionable because they rebutted defense counsel's statement: "You will have a unique opportunity to condemn what has happened, to condemn the sin but not condemn the sinner." Id. In Bonifay v. State, 680 So.2d 413 (Fla.1996), without detailing the nature of the references made, we also found that the prosecutor's "biblical references" during closing argument were not fundamental error. Id. at 418. Nevertheless, we "caution[ed] against the use or approval of arguments which use references to divine law because argument which invokes religion can easily cross the boundary of proper argument and become prejudicial argument." Id. at 418 n. 10.
In Ferrell, we addressed a similar problem. A juror stated on voir dire that she was recalling biblical sources to help her with her personal feelings on the death penalty. 686 So.2d at 1327. In response, the trial judge stated that Christian and Jewish scholars had determined that the Ten Commandments did not say "thou shall not kill," but "thou shall not commit murder." Id. He added further: "[W]hen attorneys ask you, can you sit in judgment, you are not talking about sitting in judgment of a person morally or socially or any other thing, but just make a determination of guilt or innocence." Id. at 1328. We held that these comments were not fundamental error, because "the judge's brief discussion was harmless when viewed in light of the entire record." Id.
In other similar instances, we have consistently held that a prosecutor's references to biblical authority during closing argument were not fundamental error. See, e.g., Lugo v. State, 845 So.2d 74, 110 (Fla.2003) (where the prosecutor made "no mercy" and "religion" arguments); Lawrence v. State, 691 So.2d 1068, 1074 (Fla. 1997) (concluding that the prosecutor's statements, which equated the jury's sentencing task to "God's judgment of the wicked," were similar to the prosecutor's comments in Bonifay).
The dissent relies on several cases in arguing that the prosecutor's conduct here was fundamental error. It first claims that, in Meade v. State, 431 So.2d 1031 (Fla. 4th DCA 1983), the Fourth District Court of Appeal found a prosecutor's invocation of religious doctrine improper. Dissenting op. at 638-39. In Meade, defense *631 counsel objected and the trial court denied the motion. 431 So.2d at 1032. Therefore, unlike the case before us, the issue in Meade was preserved for appeal, and the standard of review was whether the prosecutor's conduct was prejudicial. See id. The district court held that it was and reversed the defendant's manslaughter conviction. Id. at 1033. Here, in order to decide whether appellate counsel rendered ineffective assistance for failing to raise a claim of prosecutorial misconduct, we must determine whether the alleged misconduct (which was not preserved) was fundamental errora higher standard than the one in Meade. Because the district court in Meade did not evaluate the prosecutor's conduct under this standard, the case does not apply here. The dissent's reliance on Harper v. State, 411 So.2d 235 (Fla. 3d DCA 1982), is incorrect for the same reason. See dissenting op. at 639. As in Meade, defense counsel in Harper objected to the prosecutor's invocation of religious authority, effectively preserving the issue for appeal. See Harper, 411 So.2d at 236-37. Thus, the standard was the same as in Meade. See id.
In this case, we find that the prosecutor's conduct was not fundamental error for three reasons: (1) Davis's earlier testimony; (2) the prosecutor's freedom on cross-examination; and (3) the prosecutor's conduct in light of the entire record.
First, it was Davis's testimony on direct examination, not the prosecutor, that first introduced religion into the proceedings. The State correctly argues that Anthony takes Davis's cross-examination out of context. Davis was a minister in Anthony's prison and frequently visited him. On direct examination, he stated that Anthony joined Stetson Baptist Church and professed his Christianity to other inmates. He believed that Anthony "had a life-changing experience." Then on cross-examination by Jeffrey's defense counsel, Davis stated the following:
There's no rehabilitation. Regeneration is the only thing that's going to work. And there's talk that some day we are going to have ... possibly a model Christian prison.... If we ever see that in Florida, maybe we can see the recidivism rate turn around....
If we don't change the human and give him values and teach him how to do something different, rather than just locking him up and saying, okay, we are just going to keep you in this cell and treat you like a dog. We have got to do something. We have got to teach them.
In addition, when asked about the capacity of both Jeffrey and Anthony to help convert people to religion, Davis stated the following:
Yes. Both of them by their lifeby their witness of what they have been through and they can be a witness to others and possibly turn their lives around....
And sometimes inmates won't come out and hear what I have to say, but they will respect a fellow inmate and listen to his testimony.
Davis's testimony attempted to build a case for mitigation and dissuade the jury from recommending the death penalty. Like the juror in Ferrell and the defense attorney in Street, Davis initially broached religion. In response, the prosecutor, like his counterpart in Street and the judge in Ferrell, attempted to reconcile that subject with the issues before the court.
Second, the prosecutor's conduct is less egregious because it occurred during cross-examination and not during argument to the jury. The United States Supreme Court has stated that cross-examination is "the principal means by which the believability of a witness and the truth *632 of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). "[T]he cross-examiner is ... permitted to ... test the witness' perceptions and memory" and "impeach, i.e., discredit, the witness." Id. We have stated that "questions on cross-examination must either relate to credibility or be germane to the matters brought out on direct examination." Penn v. State, 574 So.2d 1079, 1082 (Fla.1991) (quoting Steinhorst, 412 So.2d at 337).
In this case, the prosecutor's questions, which were objectionable and could possibly have resulted in reversal of the conviction had the issue been preserved, did not rise to the level of fundamental error. It was not an unethical biblical argument aimed at persuading the jury to recommend the death penalty. The prosecutor's questions were related to Davis's testimony on direct examination. Davis highlighted Anthony's ability to profess Christianity to other inmates and the importance of "regeneration," rather than punishment, as a solution for crime. Davis was a minister, which conveyed to the jury a level of authority on religion. The prosecutor's conduct was an attempt to discredit Davis's testimony and illustrate to the jury that nothing prohibited it from recommending the death penalty. This conduct was similar to the judge's comments in Ferrell. In that case, the judge responded to a juror's express reliance on biblical sources for her personal feelings on the death penalty. He explained that the Ten Commandments only prohibited individuals from "commit[ing] murder" rather than articulating a prohibition on all killing. Ferrell, 686 So.2d at 1327. This clarification implies that the Bible does not prohibit the government from imposing the death penalty. In this case, the prosecutor apparently intended the same message.
In Street, a similar situation arose when defense counsel used religious references during closing argument to dissuade the jury from recommending the death penalty. In response, the prosecutor asked the jury: "Should we excuse the sinner? Should we thank the sinner? Is that our job; is that our obligation under the law?" 636 So.2d at 1303. This language, like the prosecutor's conduct in the case before us, seems like an attempt to defuse the argument that religion discourages imposition of the death penalty.
Nevertheless, in this case the prosecutor went further and introduced a Bible into the proceedings and asked a witness to read specific verses from it. In the transcript, this exchange lasted eight pages. The prosecutor should have refrained from this type of conduct. However, his behavior falls short of fundamental error. The penalty phase lasted five days and comprises 1244 pages of transcript. Davis was only one of thirty-six witnesses. The jury found five aggravating circumstances, including the HAC and CCP aggravators, "two of the most serious aggravators ... in the statutory scheme." Larkins, 739 So.2d at 95. Davis's testimony did not address any of the aggravators. Without the prosecutor's cross-examination of Davis, the jury still would have recommended the death penalty. The prosecutor's cross-examination, while improper, did not "reach down into the validity of the trial itself to the extent that [the jury's verdict] could not have been obtained without the assistance of the alleged error." Harrell, 894 So.2d at 941. Nor did the exchange between the prosecutor and the minister impact the "foundation of the case." Ray, 403 So.2d at 960. Following our "very guarded[]" approach to this doctrine, we find in this case no "compelling demand for its application." Id. The prosecutor's conduct was not fundamental error.
*633 The dissent nonetheless relies on case law from other jurisdictions, arguing that "other courts have ... been quick to condemn similar references to biblical authority to support imposition of the death penalty." Dissenting op. at 639. Although these cases are not binding on this Court, we examine one of them to emphasize the reasons for our conclusion here. The dissent cites Romine v. Head, 253 F.3d 1349 (11th Cir.2001), which held that a prosecutor's extensive reliance on biblical authority rendered the sentencing phase of the trial fundamentally unfair. See id. at 1371.[11] As in Anthony's case, there was no proper objection to the prosecutor's remarks. Id. at 1370. However, the circumstances in Romine are distinguishable from those here.
In Romine, the court stated that an examination of the "entire context of the judicial proceeding" was necessary to determine whether the prosecutor's remarks rendered the proceeding fundamentally unfair. Id. at 1369 (quoting Brooks v. Kemp, 762 F.2d 1383, 1400 (11th Cir. 1985)). The sentencing phase of the trial in Romine was "saturated with evidence relating to religion." Id. at 1369.[12] "[T]he jurors [were] sequestered at a Baptist assembly, where the judge suggested having `Brother Caylor out there' put the jurors in a room and `give you a good sermon.'" Id. at 1369. Furthermore, "the prosecutor in his closing argument gave the jurors a hell fire and brimstone mini-sermon the effect of which was to tell them that regardless of the law of Georgia, they ought to follow the law of God ... to rule out any consideration of mercy." Id. These "remarks were strategically placed at the end." Id. In addition, one of the jurors consulted a Bible during deliberations. Id. at 1369 n. 20. Finally, defense counsel did not invite the prosecutor's references to religion because he had not argued yet and, when he did, there was no response that adequately ameliorated the effect of the prosecutor's argument. Id. at 1369. The court concluded that, "[i]n view of all of the facts and circumstances, the prosecutor's improper argument ... undermine[d]... confidence in the sentencing result." Id. at 1371.
By contrast, in Anthony's case there was no other evidence about religion, and there were no questionable tactics used in sequestering the jurors. No jurors consulted a Bible. Moreover, it was Davis's testimony on direct examination that introduced religion into the proceedings. When viewed within the totality of the circumstances, the prosecutor's conduct does not rise to the level of fundamental error. Most importantly, the conduct at issue occurred during cross-examination and not during closing argument. This distinction is critical. In Romine, a similar exchange occurred in a cross-examination of a witness: "Romine's grandfather... appeared as a witness on behalf of Romine. The prosecutor cross-examined him about scripture, asking him whether he believed in the New Testament verse that commanded `honor your mother and father or be put to death.'" Id. at 1358-59. The court, in dictum, concluded that *634 this conduct "alone would not have been constitutionally problematic." Id. at 1359. Instead, the court took issue with the prosecutor's remarks during closing argument: "The problem is the prosecutor argued biblical law to the jury as a basis for urging it to eschew any consideration of mercy and sentence Romine to death, and that argument came against a background of circumstances that aggravated the error." Id. at 1358. As the Eleventh Circuit implied in Romine, the effect of arguing something directly to the jury is more powerful than the impression given by an exchange between a prosecutor and a witness. The circumstances in Romine and the placement of the prosecutor's remarks distinguish it from the case before us.
Because we conclude that there was no fundamental error, "appellate counsel may not be deemed ineffective for failing to challenge an unpreserved issue on direct appeal." Hendrix, 908 So.2d at 426.
Even assuming the error was fundamental, we have held that "appellate counsel is not necessarily ineffective for failing to raise a claim that might have had some possibility of success; effective appellate counsel need not raise every conceivable nonfrivolous issue." Valle v. Moore, 837 So.2d 905, 908 (Fla.2002) (citing Jones v. Barnes, 463 U.S. 745, 751-53, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), and Provenzano v. Dugger, 561 So.2d 541, 549 (Fla.1990)). In this case, appellate counsel's brief was 96 pages long and raised ten issues.[13] He also filed a supplemental brief raising two claims related to the appropriateness of his death sentence after Jeffrey had been sentenced to life imprisonment. Farina, 801 So.2d at 49. Appellate counsel could have reasonably concluded that these issues represented his strongest arguments. He could have reasoned that the prosecutor's alleged misconduct, given that it was not properly objected to, was a weaker claim with less chance of success. Thus, counsel was not ineffective for failing to raise it on appeal. Accordingly, we deny relief.

B. Closing Argument
Anthony also takes issue with the prosecutor's final statement during closing argument: "They have brought this judgment upon themselves by their choices, and your recommendation to this Court should be a recommendation that they pay the ultimate penalty for their crimes." Defense counsel did not object at all to this statement, thus failing to preserve the issue.
Anthony, however, argues that this statement was fundamental error. At first, it is unclear whether the prosecutor made any biblical references at all, given that he used common terms. Nevertheless, when read in conjunction with Davis's testimony on cross-examination, a few similarities come to light. For instance, the prosecutor's statement that "[t]hey have *635 brought this judgment upon themselves," resembles a line that Davis read from the Book of Romans: "[Those] who rebel[] against the authority .... will bring [judgment] on themselves." Furthermore, the prosecutor urged the jury to recommend that Anthony and Jeffrey "pay the ultimate penalty for their crimes." These words resemble similar language uttered by Davis in response to the prosecutor's question, "What happened to Paul ultimately?" Davis responded that "Paul was killed ultimately." In addition, the prosecutor referred to the death penalty twice during his cross-examination of Davis. These similarities suggest that in his closing statement the prosecutor alluded to the Book of Romans.
Because these comments were made during closing argument, this issue fits squarely within our precedents. The prosecutor's allusions are facially ambiguous. Even if the jury successfully linked these phrases to the verses read by Davis the day before, they still lack the force of other more obvious references we previously held did not constitute fundamental error. See Lugo, 845 So.2d at 110 (where the prosecutor made "no mercy" and "religion" arguments); Lawrence, 691 So.2d at 1074 (where the prosecutor equated the jury's sentencing task to "God's judgment of the wicked"); Ferrell, 686 So.2d at 1327 (where the trial judge stated that Christian and Jewish scholars had determined that the Ten Commandments did not say that "thou shall not kill," but that "thou shall not commit murder"); Street, 636 So.2d at 1303 (where the prosecutor included "references to and quotes from the Bible" in the closing argument). The prosecutor's closing statement was not fundamental error. Therefore, "appellate counsel may not be deemed ineffective for failing to challenge an unpreserved issue on direct appeal." Hendrix, 908 So.2d at 426. Accordingly, we deny relief.

IV. CONCLUSION
For the reasons stated, we affirm the circuit court's order denying Anthony's motion for postconviction relief, and we deny his petition for habeas corpus.
It is so ordered.
LEWIS, C.J., and WELLS, CANTERO, and BELL, JJ., concur.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which PARIENTE, J., concurs.
QUINCE, J., concurs in part and dissents in part.
ANSTEAD, J., concurring in part and dissenting in part.
While I concur in the majority's opinion in most respects, I cannot agree with its analysis or resolution of two important issues: first, Farina's claim of newly discovered evidence, and second, his claim of fundamental error in the prosecution's clever, but clearly improper, use of religion to manipulate the mitigation evidence of remorse and reform to a religious mandate of self-condemnation.

Newly Discovered Evidence
The majority summarily rejects appellant's newly discovered evidence claim based on his codefendant's subsequent reduction in sentence from death to life. The majority erroneously relies on the reason for the reduction of the codefendant's sentence to avoid application of our clearly controlling case law explicitly holding that the reduction of a codefendant's sentence constitutes a basis for postconviction relief. Scott v. Dugger, 604 So.2d 465, 469 (Fla. 1992) ("Accordingly, we hold that in a death case involving equally culpable codefendants the death sentence of one codefendant is subject to collateral review under *636 rule 3.850 when another codefendant subsequently receives a life sentence."). Nowhere in our opinion in Scott did we indicate that the reason for the codefendant's reduction in sentence was in any way relevant to such a claim.
The majority's analysis and conclusion is in direct conflict with our controlling precedent in Scott on this precise issue, where we reversed a trial court's denial of an identical claim of newly discovered evidence in postconviction proceedings:
Thus, the issue presented here is whether a codefendant's subsequent life sentence constitutes newly discovered evidence which would permit collateral relief.
Two requirements must be met in order to set aside a conviction or sentence because of newly discovered evidence. First, the asserted facts "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known them by the use of diligence." Hallman, 371 So.2d at 485. Second, "the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial." Jones v. State, 591 So.2d 911, 915 (Fla.1991). The Jones standard is also applicable where the issue is whether a life or death sentence should have been imposed. Id.

In the instant case, we find that both requirements have been met and relief is appropriate. Robinson's life sentence was not imposed until after Scott's direct appeal was completed.
Id. at 468. In Scott we not only recognized that such a claim could be raised in postconviction proceedings, we reversed the denial of relief and directed that Scott's sentence be reduced to life even though Scott was the one that had actually killed the victim and run him down with an automobile. There is simply no meaningful distinction between appellant's claim here and the decision in Scott, except that Farina's claim is even more compelling since his codefendant was the actual killer.
The majority has simply engrafted an additional qualification to our holding in Scott that cannot be squared with the opinion in Scott or its reasoning. Plainly stated, a reduction in a codefendant's sentence is a reduction in a codefendant's sentence, regardless of whether that reduction comes about by a Governor's pardon, or a trial or appellate court ruling. Under Scott, it is the fact of the reduction of a codefendant's sentence that is controlling, not the reason for the reduction. Our holding in Scott is essentially a recognition that we should not allow a human life to consciously be taken if those responsible for the decision may have relied upon an important factor that no longer exists, i.e., a death sentence of a codefendant. Today's decision cannot be reconciled with Scott's reasoning. Indeed, today's decision allows a sentence of death to stand that was recommended and approved under demonstrably false circumstances, those circumstances being that a codefendant has received a death sentence. Scott directly addressed that issue. Today's majority ignores it.
The majority's holding also constitutes a substantial violation of a capital defendant's right to present any evidence of mitigation to a judge and jury. The United States Supreme Court has ruled that a defendant has a virtually unrestricted right to present any circumstance to a jury or judge for consideration as a reason to spare his life. See Smith v. Texas, 543 U.S. 37, 44, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004) ("[T]he jury must be given an effective vehicle with which to weigh mitigating evidence so long as the defendant has met a `low threshold for relevance,' which is satisfied by `evidence which tends logically *637 to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.'") (quoting Tennard v. Dretke, 542 U.S. 274, 284-85, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004)) Today's decision violates that right. The imposition of a lesser penalty of life on the actual killer provides a codefendant with a strong argument for a life sentence. Further, common sense tells us that a jury assessing the penalty for the non-killer would want to know the punishment assessed against the actual killer, especially if the killer's punishment was limited to life.
In fact, the circumstances of this case are even more compelling than those presented in Scott. First, as noted above, it is undisputed that the codefendant now sentenced to life was the actual killer. Second, we know that the original jury for these defendants recommended death by the narrowest possible margin for Anthony, seven to five, one vote short of life, while recommending death for Jeffrey by a vote of nine to three. In other words, the jury, by its vote, obviously indicated that it felt that Jeffrey deserved a death sentence more than Anthony.[14] Under these circumstances the jury's knowledge of Jeffrey's *638 reduced sentence would clearly have made a difference.

Improper Use of Religious Law to Support Death Penalty
This Court has strongly condemned the invocation of religious doctrine either for or against the death penalty as a relevant factor in sentencing proceedings. The majority opinion makes it look like we are currently on both sides of the issue. I do not think we are. See Ferrell v. State, 686 So.2d 1324 (Fla.1996). I dissent from the majority's analysis of this issue and especially from its dismissal of the fundamental nature of the error. It is true that, in Ferrell, we found harmless a brief reference to religious law to which no objection was made. Were that the case here my vote would be with the majority. But it is patently clear from the record here that the references to biblical law in the instant case were extensive and egregious and bear no similarity to the facts of Ferrell.
In Ferrell, this Court clearly announced a rule prohibiting the invocation of religious doctrine in death penalty cases:
Without question, trial judges and attorneys should refrain from discussing religious philosophy in court proceedings. In a somewhat analogous situation, the California Supreme Court reviewed comments by a prosecutor, in which the prosecutor relied on this same commandment in seeking the death penalty.
This is precisely the sort of appeal to religious principles that we have repeatedly held to be improper. As we explained recently in [People v. Sandoval, 4 Cal.4th 155, 14 Cal. Rptr.2d 342, 841 P.2d 862, 883-84 (1992), affirmed sub nom. Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994)]: "What is objectionable is reliance on religious authority as supporting or opposing the death penalty. The penalty determination is to be made by reliance on the legal instructions given by the court, not by recourse to extraneous authority."
... The primary vice in referring to the Bible and other religious authority is that such argument may "diminish the jury's sense of responsibility for its verdict and ... imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions." [People v. Wrest, 3 Cal.4th 1088, 13 Cal.Rptr.2d 511, 839 P.2d 1020, 1028 (1992), cert. denied, 510 U.S. 848, 114 S.Ct. 144, 126 L.Ed.2d 106 (1993)]. The prosecutor here invoked the Bible to demonstrate the legitimacy of capital punishment, and even implied that defendant deserved death under God's law: "God recognized there'd be people like Mr. Wash.... Who must be punished for what they have done ... must forfeit their lives for what he's done." This was improper.

People v. Wash, [6 Cal.4th 215, 24 Cal. Rptr.2d 421,] 861 P.2d 1107, 1135-36 (1993) (citations omitted), cert. denied, 513 U.S. 836[, 115 S.Ct. 116, 130 L.Ed.2d 62] (1994).
Ferrell v. State, 686 So.2d 1324, 1328 (Fla. 1996); see also Lawrence v. State, 691 So.2d 1068, 1074 n. 8 (Fla.1997) (cautioning *639 prosecutors "that arguments invoking religion can easily cross the boundary of proper argument and become prejudicial"). Florida's appellate courts have not hesitated to take forceful action when these principles are violated. In Meade v. State, 431 So.2d 1031, 1031-32 (Fla. 4th DCA), review denied, 441 So.2d 633 (Fla.1983), the Fourth District Court of Appeal found error and reversed a manslaughter conviction where the prosecutor had argued, "There, ladies and gentlemen, is a man who forgot the fifth commandment, which was codified in the laws of the State of Florida against murder: Thou shalt not kill." Similarly, in Harper v. State, 411 So.2d 235, 237 (Fla. 3d DCA 1982), the Third District held that the prosecutor's comments to jurors about biblical teachings was an "improper appeal" to emotion. Hence, Florida law is clear in prohibiting the use of religious doctrine by prosecutors. Rather than dance around the issue, we should reaffirm that prohibition today.

Other Jurisdictions
A brief sampling of case law from other jurisdictions reflects other courts have also been quick to condemn similar references to biblical authority to support imposition of the death penalty. Importantly, the Eleventh Circuit Court of Appeals has recently held that a prosecutor's extensive reliance on biblical law violated due process and rendered the penalty phase of a capital trial fundamentally unfair, in spite of trial counsel's failure to object. In Romine v. Head, 253 F.3d 1349 (11th Cir. 2001), granting federal habeas relief, the court reasoned that the state court's decision denying relief was "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States." Id. at 1364 (quoting 28 U.S.C. § 2254(d)(1) (2000)). "[A] prosecutor misleads a capital sentencing jury when he quotes scripture as higher authority for the proposition that death should be mandatory...." Id. at 1368.
Similarly, the Supreme Court of Georgia has held it was error for a prosecutor to quote biblical passages and to urge jurors to impose a sentence of death based on religious authority. In Carruthers v. State, 272 Ga. 306, 528 S.E.2d 217 (2000), the court held that it was particularly concerned with
direct references that urge that the teachings of a particular religion command the imposition of a death penalty. In contrast to biblical law, Georgia law gives the jury the discretion to recommend life ..., provides stringent procedures and safeguards that must be followed ..., and permits the jury to impose the death penalty only in limited circumstances.
Id. at 222 (footnote omitted). "Language of command and obligation from a source other than Georgia law should not be presented to a jury." Id.
Importantly, the Supreme Court of Pennsylvania has held that reference to biblical authority to a jury as authority to sentence a capital defendant to death constitutes reversible error per se and may subject prosecutors to disciplinary proceedings. See Commonwealth v. Chambers, 528 Pa. 558, 599 A.2d 630 (1992). The Chambers opinion held that the prosecutor's closing argument, "As the Bible says, `and the murderer shall be put to death,'" constituted per se reversible error and violated due process because the jury was essentially told that "an independent source of law exists for the conclusion that the death penalty is the appropriate punishment," and the prosecutor "interjected religious law as an additional factor for the jury's consideration." Id. at 644. The court explained its rationale:

*640 Our Legislature has enacted a Death Penalty Statute which carefully categorizes all the factors that a jury should consider in determining whether the death penalty is an appropriate punishment and, if a penalty of death is meted out, it must be because the jury was satisfied that the substantive law of the Commonwealth requires its imposition, not because of some other source of law.
Id.

This Case
We should recognize that unlike the brief and harmless reference in Ferrell, the State clearly crossed the line here in mounting a deliberate strategy seeking the imposition of the death penalty based on biblical law.[15] In his habeas petition, appellant's counsel accurately summarizes the State's action:
The State presented itself as an "authority" placed in a position of power by God. The State then proceeded to tell the jury, through the witness's reading of the Bible, that (1) the Book of Romans as contained in the Bible is the "inspired word of God," (2) that Romans teaches us that the prosecutor and Judge are "authorities" established by God, but defense counsel, who may or may not be "saved," is against the authorities and anyone who is against the authorities is against God; (3) that God gives power and unquestioned legitimacy to the "authorities" to punish wrongdoers who "bring this judgment upon themselves," and everyone must "submit to the authorities" because of their "conscience;" (4) that the Bible, and therefore God, does not recognize repentance as justification to temper the authorities' punishment of wrongdoers, or in other words, repentance should not be recognized as legal mitigation by any God-fearing juror, nor should any juror consider mercy if the authorities are seeking death; and (5) that there is no inconsistency between Christ's failure to forgive the "felon" on the cross and his acquiescence in the crucifixion of the "felon," and the judge and jurors imposition of the death penalty on Anthony Farina because "[Mr. Farina has] brought this judgment upon [himself]."
Petition for Habeas Corpus at 18-19.
The prosecutor developed his improper religious theme starting with the voir dire questioning when he told prospective jurors:
[J]urors are obligated and expected, if they serve on a jury, to follow [the judge's instruction on the law], even if they don't agree with the instructions. But you're not required, or expected, to abandon deeply held religious, moral, and conscientious, or other beliefs. In other words, if the conflict is so great that you say, I would like to follow the Judge's instructions, I want to be respectful, but on this issue I couldn't follow that instruction. I couldn't do this. That's perfectly legitimate. There's nothing wrong with it. That doesn't mean you're doing anything improper or disrespecting the Court.
The State also had this exchange with the venire during voir dire:
State: You don't believe that the State's authority to take a life in appropriate *641 circumstances conflicts with your understanding of your Christian beliefs?
Juror: No. In fact, Jesus said give to Caesar what's Caesar's, and obey the law according to how you're supposed to.
In addition, the State also discussed the Christian concept of salvation during voir dire, referring to salvation as "fire insurance," because no matter how someone dies they still go to Heaven if they are "saved."
Hence, the biblical strategy began with small steps in preparing the jury for what would eventually culminate in the minister's blatantly improper cross-examination. Essentially, during cross-examination, the prosecutor, instead of limiting himself to the topic of reform and rehabilitation for which the witness was called, presented the jury with a biblical roadmap by which the defendant had condemned himself to a judgment of death:
Mr. Tanner [State]: You formed some pretty strong opinions about these young men. And I believe there's sincerely hell. I want to ask you, did you rely just upon your observations and experience, or did you put any thought or evaluation into how they stacked up according to the Bible?
Davis: By the Bible's word, that and my emotion, because they were repentant to me for the crime that they had committed. And I saw signs of that in their actions and in their verbalization, and in their emotions and in their feelings. And to me that's the way I can look at something and tell whether it's what it says it is, if it appears to be that, you know.
State: But as a man of God, you certainly don't make real serious judgments or considerations without holding up your opinion to maybe God's standard and his word? Is that part of....
Davis: I'm definitely not God.
State: What I'm asking you is you put heavy reliance upon the Bible, don't you?
Davis: Yes, I do.
State: What is the Bible to you?
Davis: It's the infallible word of God, inspired word of God that God gave to us as our ....
State: But from my understanding of the Bible, is men actually men wrote the words down and you say it's the word of God?
Davis: Inspired by the Holy Spirit, right.
State: Are you familiar with the Book of Romans? Do you know who wrote it?
Davis: Paul, Apostle Paul.
State: What happened to Paul ultimately?
Davis: Paul was killed ultimately.
State: By the Roman government?
Davis: Uh-huh.
State: And even though Paul was a prisoner of the Roman government, he wrote a very significant book called the Romans; did he not?
Davis: Yes, he did.
State: Are you familiar with the first of seven verses of Romans thirteen?
Davis: Yes. About honoring authority, submitting to authority. The judge and the prosecutor and the defense attorneys all work for God and are ordained by God as being the authority and in the positions that they are and if they ... God is the one that allows them to be there.
State: Well, I don't want to say that defense attorneys aren't saved. But they're not the authorities, are they, they are defense lawyers versus the prosecutor?
Davis: Right.

*642 State: Your honor, may I hand him something to help with his memory as well?
Mr. Hathaway [Anthony Farina's Defense counsel, hereinafter Defense] Your honor, I don't know what he's tendered to the witness.
State: Romans.
Davis: It's a copy of the Bible, scripture out of the Bible.
State: What does Romans one and two say about authority under God's law?
Defense: Perhaps he can show the relevancy of this. I don't know why we are referring to this at this time....
Relevance objection.
State: Your honor, I will link it up when I lay the foundation. I believe you will see the relevancy as we ....
Court: To this witness' testimony, not just a philosophical or religious discussion?
State: No, sir.
Court: This is specific testimony?
State: Yes. It will relate directly to this witness' testimony.
Court: Connect it up. And, Mr. Hathaway, if it's not properly connected up, go ahead and renew your objection.
Davis: Read verse one and two?
State: Yes, sir.
Davis: Everyone must submit himself to the governor of authorities for there is no authority except for which God has established. The authorities that exist have been established by God. Consequently, he who rebels against the authority is rebelling against what God has instituted. And those who do so will bring judgment on themselves.
State: The next verse deals with the prosecutor; does it not? What does it say?
Davis: For the rulers hold no terror for those who do right, but for those who do wrong. Do you want to be free from fear that the one in authority and do what is right and you willjumps over herehe will command you.
State: And the next verse?
Davis: Where he is God's servant to do your good, but if you do wrong, be afraid for he does not bear the sword for nothing. He is God's servant and agent to wrath, to bring punishment to the wrongdoer.
State: And the next?
Davis: Therefore, it is necessary to submit to the authorities not only because of the possible punishment, but also because of your conscience.
State: Is there anything in scripture that you find that says the laws and the government should excuse crimes because someone is repentant?
Davis: Specifically the law and government, no.
State: Tells us Christians forgive one another?
Davis: Yes.
State: But that's not inconsistent with the government's responsibility to uphold the law and bring the punishment whichand the word of the Lord, that you have just read, that bring judgment on themselves; is that correct?
Davis: That's correct.
State: ... [W]hen Christ was on the cross there was a condemned felon beside him that repented and accepted Christ, is that right?
Davis: That's right.
State: But he didn't take that felon off the cross or forgive the death penalty, did he?
Davis: No.
State: He said he would see him in paradise.

*643 Davis: Yeah.
State: Christ died for sinners?
Davis: Yes.
State: And Paul died because of Christ?
Davis: Yes.
State: Is there anything inconsistent with that. That these men face the death penalty for the murder of a seventeen-year-old girl?
Davis: No.
Finally, in culmination of his biblical death penalty judgment strategy, the prosecutor chose as his final statement to the jury in closing argument: "They have brought this judgment upon themselves by their choices, and your recommendation to [the trial court] should be a recommendation that they pay the ultimate penalty for their crimes."

CONCLUSION
Critically, the conduct of the prosecutor in this case was particularly egregious and can in no way be compared to the brief reference found harmless in Ferrell. The prosecutor's misconduct reached its high point when the defense put on a minister who was counseling the defendant to show that the defendant had remorse and was reforming his life. The prosecutor, however, in an obviously planned and well-prepared, but grossly improper, cross-examination essentially got the mitigation witness to condemn the defendant to death by quoting passages from the Christian Bible. Obviously, the mitigation witness for the defendant had no idea his testimony would be manipulated and used, not as mitigation, but as a religiously prescribed mandate for a judgment of death. The prosecution then cleverly used a paraphrase of the same self-condemnation passage from the Bible in its final argument to induce the jury to sentence the defendant to death.
That this improper strategy was successful is made clear by a comparison of the previous jury's vote on the same facts recommending death by a seven to five vote, one vote short of life, while the latest jury subjected to the prosecutor's appeals to religious law voted for death twelve to zero. Of course, under the prosecution's theory based on religious dogma, it was not the jury that was condemning the defendant to death, it was the defendant himself, since the biblical scripture explicitly said so. This blatant and emotional appeal to religious authority to guide the jury's decision clearly infected the fundamental fairness of the proceeding and should be condemned.
PARIENTE, J., concurs.
NOTES
[1] In Farina's first direct appeal, we referred to his brother's direct appeal for the factual and procedural background of the case. Farina v. State, 679 So.2d 1151, 1153 (Fla.1996). Therefore, the facts are taken from the direct appeal of Jeffrey Farina, see Farina v. State, 680 So.2d 392, 394 (Fla.1996), as well as Anthony's direct appeal, Farina, 679 So.2d at 1153, and Anthony's second direct appeal. See Farina v. State, 801 So.2d 44, 48-49 (Fla. 2001).
[2] Because appellant and his brother share the same last name, and because several of the issues refer to both individuals, to avoid confusion we will refer to Anthony and Jeffrey Farina by their first names.
[3] The aggravating factors were: (1) prior violent felony based upon the attempted murders of the other restaurant employees; (2) the murder was committed to avoid arrest; (3) the murder was committed for pecuniary gain; (4) the murder was heinous, atrocious, or cruel (HAC); and (5) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). Farina, 801 So.2d at 48. The statutory mitigators were: "Anthony had no significant history of prior criminal activity; he was an accomplice in the capital felony committed by [Jeffrey] and his participation was relatively minor; he was eighteen years old at the time of the crime ...." Id. at 49. The nonstatutory mitigators were: "abused and battered childhood, history of emotional problems, cooperation with the police, involvement in Christianity and Bible study courses while in prison, good conduct in prison, remorse for what happened, assertion of a positive influence on others, no history of violence, abandonment by his father, poor upbringing by his mother, lack of education, good employment history, and amenability to rehabilitation[]." Id.
[4] The following claims are procedurally barred because they should have been raised on direct appeal: 1(c) (the testimonies of two witnesses from the evidentiary hearing rebut the CCP and HAC aggravating factors), 5(a), (c), (f)-(g), (j)-(n) ((a) Florida's capital sentencing statute is unconstitutional for failing to prevent the arbitrary and capricious imposition of death; (c) lethal injection is cruel and unusual punishment; (f) the murder in the course of a felony aggravator is an unconstitutionally automatic aggravating circumstance; (g) Florida's capital sentencing statute is vague and overbroad; (j) the CCP aggravator is unconstitutionally vague; (k) the aggravating factors were not proven beyond a reasonable doubt; (l) the CCP jury instructions are unconstitutionally vague; (m) comments by the State and the trial court denigrated the jury's sense of responsibility; (n) Florida's capital sentencing statute is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002)).
[5] We reject as meritless claims 2 (the circuit court erred in denying the issues included in amendments to claims three and five of Anthony's 3.851 motion for postconviction relief), see Fla. R.Crim. P. 3.851(f)(4) ("A motion filed under this rule may be amended ... upon motion and good cause shown.") (emphasis added), 4 (the circuit court erred in denying several claims without an evidentiary hearing), see Fla. R.Crim. P. 3.851(f)(5)(B) ("[T]he trial court ... shall determine whether an evidentiary hearing should be held.... If the motion, files, and records ... conclusively show that the movant is entitled to no relief, the motion may be denied without an evidentiary hearing."), and 5(o) (ineffective assistance of counsel for failure to (i) object to the prior violent felony, HAC, CCP, and murder in the course of a felony aggravating factors on the grounds that they are unconstitutionally vague and overbroad; (ii) object to comments and instructions that diminished the jury's sense of responsibility under Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); and (iii) argue that the State failed to prove the aggravators beyond a reasonable doubt), see Teffeteller v. Dugger, 734 So.2d 1009, 1023 (Fla.1999) ("Trial counsel cannot be deemed ineffective for failing to raise meritless claims or claims that had no reasonable probability of affecting the outcome of the proceeding.").
[6] Claims 5(b) (electrocution is cruel and unusual punishment); 5(d) (Florida's capital sentencing statute fails to provide adequate guidance to jurors); 5(e) (the aggravating factors are applied in a vague and inconsistent manner); 5(h) (the prior violent felony aggravator is unconstitutionally vague); 5(i) (the HAC aggravator is vague and overbroad).
[7] Claim 3 (cumulative errors deprived Anthony of a fair trial) is procedurally barred because Anthony raised it in his initial brief. Claim 4 (Urbin v. State, 714 So.2d 411 (Fla. 1998), when read in conjunction with the United States Supreme Court's recent holding in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), warrants a reweighing of the age mitigator) is procedurally barred because Anthony should have raised it on direct appeal. See Johnson, 593 So.2d at 208 ("Issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack."). Furthermore, the trial judge at resentencing did not violate Roper because Anthony was already 18 years old when he committed his crimes. See Roper, 543 U.S. at 578, 125 S.Ct. 1183 ("The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed.").
[8] Claims 1(b) (ineffective assistance of appellate counsel for failure to raise a claim that the victim impact testimony was inadmissible); 1(c) (ineffective assistance of appellate counsel for conceding at oral argument that the victim impact testimony was not objectionable); 1(d) (ineffective assistance of appellate counsel for failure to raise a claim that the prosecutor engaged in improper argument by comparing the lives of Anthony and Jeffrey to that of the victim); 1(e) (ineffective assistance of appellate counsel for failure to raise claims of prosecutorial misconduct based on several alleged improper arguments). In addition, in a footnote included within the discussion of claim 1(a) Anthony alleges ineffective assistance of appellate counsel for failure to raise a claim of prosecutorial misconduct based on improper biblical references during jury selection. Because Anthony's arguments fail to allege specific objectionable errors, there is no basis for a claim of ineffective assistance of appellate counsel and, therefore, they are procedurally barred.
[9] The dissent goes even further, claiming that the State "mount[ed] a deliberate strategy seeking the imposition of the death penalty based on biblical law," dissenting op. at 640, which began with the voir dire questioning. The dissent quotes from Anthony's habeas petition, where he argues in a footnote that appellate counsel rendered ineffective assistance for failing to raise three additional claims of prosecutorial misconduct based on statements made during the jury selection process that referred to religious authority. See supra note 8. Defense counsel never objected to these statements and thus failed to preserve them. They also do not constitute fundamental error. Anthony takes each of the statements out of context. When read as a whole, the statements are not prejudicial. Appellate counsel may not be deemed ineffective for failing to challenge them on direct appeal. Hendrix v. State, 908 So.2d 412, 426 (Fla.2005) (citing Rutherford v. Moore, 774 So.2d 637, 646 (Fla.2000)).
[10] In its discussion claiming that a rule prohibiting this conduct exists, the dissent quotes at length from Ferrell. See dissenting op. at 638. In doing so, the dissent seems to rely on a comparison between the facts in this case and a California Supreme Court case cited in Ferrell. This case, People v. Wash, 6 Cal.4th 215, 24 Cal.Rptr.2d 421, 861 P.2d 1107 (1993), is not binding on this Court. Even if it were persuasive, it does not help the dissent's position. In Wash, the prosecutor invoked the Bible to demonstrate the legitimacy of capital punishment and implied that the defendant deserved death under God's law. Id. at 1135 n. 18. The California Supreme Court found the comments improper. Nevertheless, it refused to conclude that they were prejudicial: "[V]iewed in context we do not find the prosecutor's remarks here to be prejudicial." Id. at 1135.
[11] The dissent also relies on two cases from Georgia and Pennsylvania.
[12] This evidence included testimony about Romine's religious upbringing and his subsequent rejection of Christian values; his deeply religious parents; how he and his wife had been very active in local church activities at the beginning of their marriage; their participation in a gospel singing group; Romine's having preached at several churches in the area; evidence linking Romine's rejection of Christian values to his descent into adultery, drug use, and murder; and Romine's own testimony that his misbehavior was attributable to the "devil's doings." Romine, 253 F.3d at 1358.
[13] These were: (1) the State improperly used peremptory challenges to strike two African-American jurors; (2) the trial court erred in denying Anthony's motion in limine to prohibit the introduction of his taped conversation with his brother Jeffrey; (3) the trial court erred in denying Anthony's motion to suppress this taped conversation; (4) the trial court erred in denying Anthony's motion to sever his resentencing proceeding from Jeffrey's; (5) the trial court erred in admitting victim impact evidence, in allowing the evidence to become the main feature of the trial, and in refusing to give a requested limiting instruction; (6) the HAC aggravating circumstance was improperly found; (7) the CCP aggravating circumstance was improperly found; (8) the avoid arrest/witness elimination aggravating circumstance was improperly found; (9) the death sentence is not appropriate; (10) Florida's death penalty is unconstitutional on numerous grounds. Farina, 801 So.2d at 49.
[14] Of course, the jury was also presented with other substantial mitigating circumstances concerning Anthony. In an earlier appeal the trial court's findings on mitigation at the original sentencing were set out:

The trial court, in a detailed evaluation, considered three statutory mitigators and some fifteen separate nonstatutory mitigators. [n.5] In addition to Anthony not being the actual killer, it is important to note that, save Jeffery being two years younger than Anthony, the trial court found that Anthony had actually demonstrated more mitigation than Jeffery. For example, the record reflects without dispute that Anthony was sexually and physically abused repeatedly as a child.
[n.5] As noted by the majority opinion, the judge found three statutory mitigating factors (no significant history of criminal activity, Anthony was an accomplice in capital felony committed by Jeffery and his participation was relatively minor, age of eighteen at the time of the crime) and fifteen nonstatutory mitigating factors (abused and battered childhood, history of emotional problems, cooperation with the police, involvement in Christianity and Bible study courses while in prison, good conduct in prison, remorse for what happened, assertion of a positive influence on others, no history of violence, abandonment by his father, poor upbringing by his mother, lack of education, good employment history, and amenability to rehabilitation).
The record reveals a horrendous childhood for both the Farina brothers. Their father was approximately forty years older than their mother and when he left the mother when the boys were still preschool age, he also abandoned the boys completely and had no contact with them. The mother was an alcoholic who would move on a whim (over twenty moves in Anthony's eighteen years; from Wisconsin to Illinois to Florida to Illinois to California to Florida, etc.), took up with a series of men who did nothing to support the family, and offered no guidance to the boys. From a young age the boys were often supporting the family and various adults and young children who were living with them by whatever jobs they could get, by scavenging for recyclable materials to sell, or by shoplifting at the mother's request (actually, the testimony was that the mother forced the boys into shoplifting by telling them that they would do it if they loved her and their young sister). Various relatives, social workers, and law enforcement officers also reported that the boys lived in deplorable conditions (dog feces on the floors of the living quarters, filth and squalor, no decent food). Sometimes they shared a one-room hotel room or trailer with as many as ten to fifteen people.
Anthony was physically abused by one of his stepfathers and placed in a state facility for eighteen months because of the abuse. His mother never visited or called him during that time. Anthony was also sexually abused as a young boy and as a result developed an inability to control his bowels. While Anthony has no formal record of criminal activity, he has committed a number of petty crimes including shoplifting and using illegal drugs (marijuana and crack). Despite all of this, it appears that Anthony had a good employment history, albeit at low-paying jobs. Both boys received an erratic education and Anthony never finished one year of school in the same school.
Farina v. State, 801 So.2d 44, 58-59 (Fla. 2001) (Anstead, J., concurring in part and dissenting in part).
[15] The majority is correct that counsel, after first clearly and properly objecting to the State's improper cross-examination on biblical authority supporting the death penalty, did not follow up with a motion to strike. However, it is apparent that defense counsel's initial objection was clearly valid, and the trial court's ruling was erroneous in permitting the State to continue on a blatantly irrelevant and prejudicial path that only got worse.